## THOMPSON a. VAN VECHTEN.

*New York Superior Court; Special Term, June,* 1857.

MORTGAGES ON VESSELS.—REGISTRY.—FILING.—RIGHTS OF MORT-
GAGEES OF CHATTELS.—JUDGMENT ON CONFESSION.—DORMANT
EXECUTION.

The act of Congress of July 29, 1850 (9 *U. S. Stats.*, 440), relating to the record-
ing of conveyances and mortgages upon vessels,—prescribes, as to all vessels of
the United States, a rule as obligatory upon the State tribunals as upon those
of the United States; but it does not supersede or abolish statutory regulations
of a State upon the same subject which are not inconsistent with it.

Hence if a mortgage of a vessel is not registered at the custom-house, as required
by the act, it will be invalid as to purchasers or mortgagees without notice,
although every State law may have been complied with; and on the other
hand, although it is registered at the custom-house, yet if a State statutory
requisition has been neglected, the mortgage will give place to a subsequent
transfer or mortgage, also registered, and in respect to which the State law has
been fulfilled.

Where a party colorably bought a vessel upon which there was a mortgage lien,
and took an assignment of the lien, which he afterwards assigned to a *bona fide*
lender of money on the faith of the assignment,—*Held*, that though the lien was
extinguished so far as the purchaser of the vessel was concerned, it was not ex-
tinguished as against the assignee of the lien.

Under the provisions of 2 Revised Statutes, 136, §§ 5, 6,—designating the
creditors of a vendor of chattels who may avail themselves of the neglect of a
mortgagee to take and hold possession,—creditors who become such at any time
while the possession still remains in the mortgagor, are included.

The term "creditors" in the above-mentioned provisions embraces simple contract
creditors; although these cannot assert their rights until they have obtained
judgment, and, as to personal property, execution.

The holder of a promissory note for value may be a creditor within the above-
mentioned provisions; although the note does not become *due* until after the
mortgagor's possession has terminated.

The creditors in whose favor a chattel mortgage is to lose validity unless *refiled*
(under 2 Revised Statutes, 136, § 11), are the same as the creditors against
whom it is declared to be originally invalid unless *filed* (under 2 Revised Stat-
utes, 136, §§ 5, 6).

The delivery of an execution to the sheriff creates a lien upon the personal prop-
erty afterwards levied upon from the date of such *delivery*, except as to one
who, between the delivery and the levy, becomes a *bona fide* purchaser or mort-
gagee without notice. With that qualification, a regular sale by the sheriff
transfers to a purchaser the title of the judgment debtor as it existed on the day
of the delivery of the writ.

Under the act of 1833, the filing of a chattel mortgage of a previous date renders

Thompson *a.* Van Vechten.

it a mortgage as of the day of filing, and gives precisely the same force and effect as if it were then dated and filed, as to subsequent purchasers and creditors.

Although a mortgagee is exempted from the necessity of taking possession under the statute of 1830, he must yet file and refile his mortgage to prevent the priority of a subsequent *bona fide* mortgage given by the vendee of his mortgagor.

The filing a chattel mortgage under the act of 1833, is not a substitute for taking possession, and does not enable the mortgagor to continue possession; it only adds a new substantive ground upon which the mortgage must be declared void if the direction of the statute is not followed.

If the mortgage is duly filed, the mortgagee is placed in a position to excuse his omission to take possession; if it is not filed, he cannot be admitted to explain it.

A judgment upon confession was entered upon the following statement of indebtedness: "The above indebtedness arose on the sale and conveyance by the plaintiff to the defendant of his right, title, and interest in the boats, property, and effects of W. M. & Co. in January, 1854; and I hereby state that the sum above by me confessed is justly due to the said M. S., plaintiff, without any fraud whatever."

*Held,* that this was not a sufficient statement of the facts out of which the indebtedness arose.

The mere acquiescence of an execution creditor in the delay of a sheriff in selling under an execution, where the creditor does not direct such delay, does not render the execution dormant as to subsequent ones; but delays directed by the creditor render the execution dormant as to subsequent purchasers and mortgagees, as well as executions.

Action tried by the court.

This action was brought by George S. Thompson against Abraham Van Vechten, James H. Elmore, Prosper P. Shaw, Marius Schoonmaker and one Griffiths, John Orser, sheriff, and one Berbeck. The object of the suit was to determine the priority of the claims of the respective parties to the proceeds of the steamboat Alida. The facts are stated in the opinion.

*Mr. Sherwood,* for the plaintiff.

*Mr. Moore,* for the defendant A. Van Vechten.

*Mr. McMahon,* for defendant Elmore.

*Mr. Burrill,* for defendant Shaw.

*Mr. Fullerton,* for defendants Schoonmaker and Griffiths.

*Mr. Vanderpoel,* for defendant Orser.

*Mr. Marbury,* for defendant Berbeck.

HOFFMAN, J.—The numerous and able counsel before me

concur in one point, that (except as to their respective clients' rights) the case is full of intricacy and doubt. I agree with them, without the exception.

The claim of Abraham Van Vechten is the first in date of the liens asserted, and that of Prosper P. Shaw the second. If these parties succeed, the whole of the fund will be required to pay them; and it has struck me, that the investigation of their demands will be the readiest mode of bringing into view and determining the leading questions which have been discussed.

But two points of general importance in the cause should first be decided. One relates to the operation of the Act of Congress of July 29, 1850; the other, to the character of the purchase of the Alida by John Van Vechten on July 17, 1854.

*First.* The act of Congress referred to (9 *U. S. Stats.*, 440), provides that "no bill of sale, mortgage, hypothecation, or conveyance of any vessel of the United States shall be valid against any person other than the grantor or mortgagor, his heirs and devisees, and persons having actual notice thereof, unless such bill of sale, mortgage, hypothecation, or conveyance be recorded in the office of the collector of the customs where such vessel is registered or enrolled."

The collectors are directed to record all such bills of sale, &c., in a book kept for the purpose, noting the time when the same was received. Indexes are to be made, and an inspection of such books permitted.

Prior to this statute, the registry or enrolment established merely the national character of the vessel. In Hozey *v.* Buchanan (16 *Peters*, 215, 1842), the court held, that the judge below was right in refusing to charge that by the act of Congress bills of sale of ships and vessels, to be valid, must be enrolled in the custom-house. "The enrolment seems not to be necessary by the act of Congress to make the title valid, but to entitle the vessel to the character of an American vessel (7 *Johns.*, 308)."

The case referred to from Johnson's Reports is that of Wendover *v.* Hogeboom. The marginal note is, that the law of the United States requiring the register to be inserted in the bill of sale on every transfer of a vessel, affects only its character and privileges as an American vessel.

In Hicks *v.* Williams (17 *Barb.*, 527), it was held that a canal-boat, though navigating the Hudson River, on its return voyage

was not "a vessel of the United States" within this act of Congress.

The statutes of March 12, 1812 (2 *U. S. Stats.*, 694), of March 3, 1825 (4 *Ib.*, 129), and of February 7, 1838 (5 *Ib.*, 304), are referred to in this case as originating as well as regulating the enrolment of steamboats. Whether this is strictly accurate or not, is unimportant. It appears to me clear that a steamboat, registered and enrolled as the Alida was, is within the act, a vessel of the United States.

I have found but little authority to throw light upon this statute. In Thomas *v.* The Steamboat Kosciusko (1 *N. Y. Leg. Obs.*, 39), Judge Betts said: "When the defence of an outstanding mortgage on a vessel is set up by a mortgagee in a United States court, even when it might retain its priority by the local law as against a tacit lien without re-registry, the mortgage becomes subject to the requirements of the United States act, and can be of no efficacy without being recorded as that act directs." "If the two legislations subsist together, that of the State certainly cannot be claimed to extinguish the act of Congress; and in this court the mortgagee must prove his compliance with the latter act, to be entitled to any advantage from the instrument as an incumbrance." The mortgage not being registered, was held invalid by the court, as against the libellant in the case, he not having actual notice of it.

In my opinion this act of Congress prescribes a rule, as to all vessels of the United States, as fully obligatory upon the State tribunals, as upon those of the United States. But it does not supersede or abolish statutory regulations of the State upon the subject, which are not inconsistent with it. It imposes another condition to the validity of a mortgage as regards all parties not expressly excepted. Hence if a mortgage of a vessel is not registered at the custom-house, it will be invalid as to purchasers or mortgagees without notice, although every State law may have been fully complied with. If it is registered at the custom-house, and a State statutory requisition has been neglected, it will give place to a subsequent transfer, or to a subsequent mortgage also registered, and as to which the State law has been fulfilled. And so in cases of successive mortgages, all registered, and all made in accordance with the law of the State, the priorities will be settled by the dates.

I do not see any serious difficulty likely to arise from thus hold-
ing the legislation of the State and Congress to be concurrently
in force; and I consider the proposition of the counsel for the
defendant Shaw, that the act of Congress furnishes now the only
rule for adjudging priorities, to be untenable.

In the present case, the first enrolment, in the name of Mar-
tin, Elmendorf, and Schoonmaker, and the transfer to Drew, were
each dated October 30, 1852; the next enrolment was in the
name of Nicholas Elmendorf, on February 25, 1854; and the
last in the name of John Van Vechten, on March 20, 1855.
The bill of sale from Elmendorf to John Van Vechten was regis-
tered at the custom-house, on February 17, 1855. The registry
of the different mortgages is hereafter stated.

*Second.* The second point of general moment to be first set-
tled relates to the character of the purchase by John Van Vech-
ten, July 17, 1854.

It was not, in my judgment, a purchase in good faith, but it
was for the use and benefit of Nicholas Elmendorf, who, I have
no doubt, would have been restored to the possession, had the
efforts to extricate the vessel from her debts been successful.

It is positively proven that a large part of the funds applied
in payment of the executions against Elmendorf came from
him. It is not proven, although both parties were examined,
that Van Vechten advanced one cent. It is inferable, that he
had not the means of paying any amount approaching the pur-
chase money. The whole of the mortgage money due Dunlap
is traced directly to Elmendorf. The note of Van Vechten to
the sheriff was a scheme to obtain time for Elmendorf's opera-
tions; and his subsequent acts and agency in almost every im-
portant transaction connected with the boat, go to prove that
Van Vechten was but a nominal owner, and the instrument of
Elmendorf.

With these two general propositions in view, I proceed to the
examination of the claims of Abraham Van Vechten and Pros-
per P. Shaw.

The material facts in relation to the claim of Abraham Van
Vechten are these:—

Prior to October 30, 1852, Nicholas Elmendorf, William Mar-
tin, and Marius Schoonmaker were the owners of the steamboat
Alida. On that day they executed a bill of sale of the boat to

Daniel Drew, with a defeasance, which constituted it a mortgage, to secure $30,000, for which three notes of $10,000 each were given. This instrument was recorded in the custom-house on November 2, 1852, and was duly filed in the proper clerk's office.

The notes secured by the mortgage were payable in six, twelve, and eighteen months from their date, October 29, 1852. They fell due in April and October, 1853, and April 29, 1854. There was the usual clause in the mortgage authorizing the mortgagor to remain in possession until default should be made in the payment of the notes.

The two first notes were paid at or about their maturity, at least by October 29, 1853.

On January 9, 1854, the title and interest of Martin and Schoonmaker in the boat became vested in Elmendorf; and as between the latter and Schoonmaker, the consideration was the assumption by Elmendorf of the debts of the firm of Martin & Co., and an agreement to pay Schoonmaker's advances for that firm.

On October 25, 1853, this mortgage was refiled according to the statute of 1833, its directions being fully complied with.

On June 28, 1854, Drew assigned the mortgage for a valuable consideration to A. A. Dunlap. On April 17, 1854, there remained due upon it about the sum of $7,464, including interest.

About June 28, 1854, Dunlap, through his attorney, employed one Stewart, a deputy-sheriff, to foreclose this mortgage, and he advertised the boat for sale, to be made on the 17th of July ensuing.

The sheriff of Ulster county had also advertised her for sale, under several executions in his hands, upon judgments against Nicholas Elmendorf; and this sale was also to take place on the said 17th of July.

The sale was made by the sheriff on that day subject to the mortgage, and previous to the sale notice was given by the attorney of Dunlap, that a sale under the mortgage would take place after the sheriff's sale.

The boat was bid off by John Van Vechten for the sum of $19,000, subject to this mortgage. Immediately after the sale, the amount due on the mortgage was paid to Stewart, the

deputy-sheriff employed by Dunlap, and was paid over by him to Dunlap. On the day before the sale, Nicholas Elmendorf caused the sum of $9,014 to be deposited in the Kingston Bank to the credit of John Van Vechten, and the latter had a check for the sum of $7000 drawn upon such fund in his possession at the time of the sale. John Van Vechten did not give any note or evidence, nor in any way recognize any liability to Elmendorf for this money (which was the money of Elmendorf), when paid over to Dunlap.

Shortly after such payment, and upon advice given to him to that effect, an assignment to John Van Vechten was executed and delivered by Dunlap, dated the said July 17, 1854.

On July 29, 1854, John Van Vechten assigned the mortgage to Abraham Van Vechten, in consideration of the sum of $5,545, money advanced by Abraham to or for the use of John.

I have concluded that Abraham Van Vechten is not chargeable with knowledge of the arrangement between Elmendorf and John Van Vechten, and is entitled to be considered as a purchaser in good faith of this mortgage.

In my opinion, the transaction was merely an appropriation of the moneys of the debtor to the payment of his own debt, through an agent; that thereby, as to John Van Vechten, the mortgage was extinguished, and no assignment of it could confer any right upon him individually. In his hands, and for any purpose personal to himself, it was annulled.

But the case is very different when the rights of Abraham Van Vechten are considered. I must regard him as an honest purchaser. And here it is to be noticed that Nicholas Elmendorf knew of the assignments, and that the money advanced by Abraham Van Vechten went, principally at least, in discharge of Elmendorf's debts.

Then the question arises: Had John Van Vechten been a purchaser in good faith, advancing his own money, or responsibility discharged by himself, for the mortgage, would not the assignment to him have kept it alive, and as much a source and muniment of title as it ever was?

I think that under the cases of James v. Morey (6 Johns. Ch. R., 429, 2 Cow., 671); of Milspaugh v. McBride (7 Paige, 509); Clift v. White (2 Kern., 519); and the valuable case of Heath v. West (6 Fost., N. H. R., 200), this would have been the re-

sult. And I think that Abraham Van Vechten has a right to have the assignment treated as if it had been made under such circumstances.

That difficulty being removed, and the mortgage being in force, and legally assigned for value to Abraham Van Vechten, the next question which occurs is, whether it is otherwise invalid, and as to whom, if to any one?

Under the statement of the rule of this court, in Hull *v.* Carnley (2 *Duer*, 109), which I do not understand to be affected upon this point, by the reversal on appeal (1 *Kern.*, 505), the omission to take possession prior to April 29, 1854, was not such evidence of fraud as to avoid the mortgage. The debt was not due till then, and the possession of the mortgagor was in literal compliance with the provisions of the mortgage.

On October 29, 1853, the mortgage was refiled, which continued the compliance with the statute of 1833, until and including October 24, 1854.

On May 4, 1854, the sheriff levied upon the boat under some of the numerous executions under which sale was made in July.

On June 28, 1854, Dunlap took measures to foreclose his mortgage and sell the vessel. This was equivalent to an assumption of possession. On the 17th of July the sale took place under the executions, and John Van Vechten became the purchaser. As ostensible owner, he exercised some acts of authority and control. As I have found Abraham Van Vechten to be a *bona fide* holder under John, I must give him the benefit of the position that the possession was that of John, obtained on the 17th of July.

Tracing forward this possession, we must first dispose of the claim of Abraham Van Vechten that he assumed it. The evidence is, that about October 24, 1854, he told Mull, who was a pilot or mate of the boat, to look after his interests, and he advertised her for the 30th of October for sale. The sale was adjourned successively up to the 10th of December. During that month, the boat was taken to New York. Her trips were resumed in May, 1855. Abraham Van Vechten never received a cent of her earnings, or paid a bill, or exercised a single power of control or direction. He, himself, says, that John Van Vechten ran her. The captain appointed in the spring of 1854, by Elmendorf, was directed by John Van Vechten to go on as

before, and received orders from him. This position of Abraham Van Vechten is wholly untenable. The possession must be treated as that of John, so far as Abraham is concerned, on the 17th of July, and for a period subsequent.

But on November 16, 1854, the coroner of Ulster county levied upon the vessel, under an execution in favor of the sheriff Griffiths, against John Van Vechten. She was then at Kingston, in the creek. She was surreptitiously taken out, and brought to New York in December. This levy was not resumed upon the vessel's return in the spring to Ulster county, but was, in effect, abandoned.

In March, 1855, the boat went into the hands of the sheriff of New York, under executions upon judgments, in favor of the Westchester County Bank. I shall, for the present, consider these executions as not dormant, but to have remained in force until September, 1855, the time of the seizure by the marshal, and commencement of this suit. In that month, both the plaintiff and Elmore asserted rights as mortgagees, employing officers to enter into possession.

Thus, upon the facts detailed, and in relation to Abraham Van Vechten's rights, the possession must be treated as in the sheriff of Ulster county from the 4th of May to the 17th of July, 1854. The possession of John Van Vechten lasted from that date to the 16th of November. The possession of the coroner then interrupted it. It is to be treated as resumed by John when the boat was in New York in December, and to have continued until March, 1855, the date of the levy under the executions of the Westchester County Bank; and that of the sheriff continued to September, as before stated.

Thus, then, Drew suffered Elmendorf, the mortgagor, to remain in possession from the 29th of April to the 4th of May, 1854; and Dunlap, the then holder, neglected to refile the mortgage on or before October 24, 1854.

Are these omissions, or either of them, fatal to this claim; and in whose favor is it invalidated, if at all?

It is not impaired in favor of plaintiff, nor of Shaw, nor of Elmore. All these are subsequent mortgagees, and each is chargeable with actual notice of the existence of the mortgage, and the claim upon it (Gregory *v.* Thomas, 20 *Wend.*, 10).

Neither can Schoonmaker raise the objection, for he is a

debtor upon the note now unpaid, to secure which the security was given. Griffiths is also precluded, for his execution became dormant, and his lien extinct.

The only question is between Abraham Van Vechten and the Westchester County Bank.

The history of the claim of the bank is this :—

On June 10, 1854, Nicholas Elmendorf gave his promissory note, payable in four months, in favor of Nicholas De Meyer, for the sum of $5,000. De Meyer endorsed it, as did John Van Vechten. It came into the possession of the bank for value. An action was commenced upon it in October, 1854, against all the parties. Answers were put in by them respectively, and on March 16, 1855, judgment was entered upon default at the trial, and an inquest taken against them all for the sum of $5,419.84, and the costs adjusted at $45.36.

Another judgment was recovered at the same time, against the same parties upon another note of the same date, time, and amount, and under the same circumstances. There is due upon the two judgments about $3,000.

Executions upon such judgments were delivered to the sheriff of the county of New York on March 17, 1855, and a levy was made upon the Alida on or about that day. Schoonmaker has become entitled to these judgments, and the benefit of the executions, by virtue of an assignment made in September, 1855.

I now assume (a point afterwards examined) that the executions were not dormant, but the lien under them remained in full force till September, 1855.

Is the bank then, or its assignee, Schoonmaker, entitled, under the statutes, to impeach this mortgage?

The sixth section of the statute of 1850 (2 *Rev. Stats.*, 136) designates the creditors who may avail themselves of the neglect of a mortgagor, to take and continue possession. It provides "that the term 'creditors,' as used in the last (the 5th) section, shall be construed to include all persons who shall be creditors of the vendor or assignor at any time while such goods and chattels remain in his possession or under his control." And the revisers say "that this was intended to include persons who were not creditors at the time of the sale, &c., but who shall become such before such possession is changed" (3 *Rev. Notes*, 657).

The phraseology of the statute plainly shows that the subse-

quent creditors are to become such while the mortgagor holds possession, or has the control.

It was observed, in the case of Williston v. Jones (Superior Ct., Gen. T., February, 1857), that the principle of the statute appeared to be this: "The continuing to uphold a fraudulent assignment is, as to subsequent creditors, precisely the same as the making it was to those of a prior date. The chief badge of fraud is the retention of possession; and the creditor who becomes such while this exists in the mortgagors, is equally defrauded, as if he was a creditor at the time of the transfer."

The provision appears to have a two-fold operation. It prevents the possible conclusion, that only existing creditors were within the fifth section; and it defines the class of subsequent creditors who may avail themselves of the provisions of that section. Their demands must have arisen during the vendor's or mortgagor's possession.

The case of Nash v. Ely (19 *Wend.*, 523) bears upon this point. It contains the principle, that the possession of a third party at the date of a mortgage (not a mere agent or servant of the mortgagor) is sufficient to relieve the mortgagee from the obligation of taking possession himself.

In Slater v. Townsend and others, I held, at special term, that where a prior mortgagee had taken possession of the property, a second mortgagee was not bound to do so under the statute. This point was impliedly sanctioned by the general term on appeal.

I understand that creditors, by simple contract merely, at the date of a mortgage, or while the mortgagor's possession lasts, are meant and protected by the statute, although they cannot assert their rights until they have obtained judgment, and, as to personal property, an execution. The case of Westcott v. Gun (4 *Duer*, 110) is not, I conceive, repugnant to this view.

I consider, also, that the holder of a promissory note for value not yet due, may be a creditor within the statute. It is a debt actually owing, with payment postponed. The statute (2 *Rev. Stats.* 47, § 38) seems to treat as creditors such holders, subjecting them to a rebate of interest; and although until the statute of 6 Geo. IV., cap. 16, § 15, a holder of a note not due could not become a petitioning creditor, yet that was under the peculiar language of the previous bankrupt law.

The bank, then, which held the notes of Elmendorf for value given, on or about the 10th of June, would be treated as a creditor within the act, although the notes did not mature until October. But then the possession had been in the sheriff since the 4th of May preceding. The bank then was not within the specification of the statute. The possession of the sheriff of Ulster, then of John Van Vechten, of the coroner and of the sheriff of New York, prevented the bank from being a creditor at any one time while the mortgagor's possession existed.

The question remains, Whether the omission to refile this mortgage before October 25, 1854, is sufficient to set it aside?

The imperative language of section 11 of the act of 1833 (2 *Rev. Stats.*, 136), led me to hesitate upon this point. Unless refiled, as directed, the mortgage shall cease to be valid. But it is so to cease as *against creditors of the person making the same*, or purchasers, &c. I have concluded that the term "creditors," here used, is to receive the same construction as is given to it in the sixth section of the Revised Statutes before quoted. It means the creditors of the mortgagee, becoming such before the mortgage, or during *his* possession or control. The statute of 1833 is a part of the system of public policy developed in the statute of 1830; and the Legislature may reasonably be deemed, in the latter enactment, to have used language found in the former, in the same sense there affixed to it.

It is true that the bank was a creditor of John Van Vechten, as well as of Elmendorf, on June 10, 1854; but John Van Vechten was not the mortgagor, and Elmendorf was not in possession. When the duty to refile arose under the letter of the statute of 1833, in October, 1854, the mortgagor was out of possession. So, treating the refiling as exactly the same as an original mortgage, the case is not within the statute—the bank is not within the designated class of creditors.

Before leaving this part of the case, I refer to a view taken by me at the trial, which should not be passed over.

Dunlap, the holder of the mortgage, put Stewart, the deputy sheriff, in possession, and advertised the boat for sale. Had he proceeded to sell, the most clear legal title that could have been made would have been made. The purchaser would have taken the oldest mortgage title, perfected by possession and sale. Instead of pursuing this course, Dunlap suffers the vessel to be

sold under the executions, and then takes payment of his mortgage and assigns it. He assigns it without even the slightest word to carry a right or title in the boat. It is merely an assignment of the mortgage. As such John Van Vechten receives it, and solely as such he transfers it to Abraham. The mortgage then was kept alive as a mortgage, and it was so intended by the parties. The consequence is, that it must be kept in legal force and operation like any other mortgage; and thus I have been compelled to discuss and decide the objections to its validity.

The result is, that Abraham Van Vechten has the first claim upon the funds in the hands of the receiver.

I propose to examine next the facts connected with the mortgage held by Prosper P. Shaw, and his claim upon the proceeds of the vessel. It is the second in date of the claims before me. On February 25, 1854, Nicholas Elmendorf executed the mortgage in question. It was registered at the custom-house on the same day. It was given to secure two notes of $6000 each, for moneys loaned in fact by one Coe; but the mortgage was taken to Shaw, his agent, and the notes, endorsed by De Meyer, were delivered to him. They were dated the 25th of February, payable in three months. The notes were renewed in May, when they fell due, and the renewals became due about August 25, 1854. There is nothing in the circumstances attending these renewals to impair the claim.

The mortgage does not contain the usual clause authorizing expressly the mortgagor to retain possession until default is made; but it has a clause as follows: "This bill of sale is given as collateral security to secure the payment of two several promissory notes of $6000 each, both bearing even date herewith, and payable three months after date with interest, and with the privilege of renewal for three months longer; said notes being made by the said Nicholas Elmendorf in favor of the said Prosper P. Shaw; payment of which notes being made at maturity, this bill of sale to become void, otherwise in full force and virtue."

Considering the principle of the rule stated in Hull v. Carnley as the doctrine of this court, I have been led to conclude that this case is as fully within that rule, as if the mortgage had contained the usual covenant as to the mortgagor's

Thompson *a.* Van Vechten.

possession. The credit given on its face is an implication of a right to continue in possession, as much as an express agreement, for this question of fraud. It is true, I have not found an authority to this effect, but the reason of the rule appears to me to cover this case.

On July 12, 1854, the mortgage was for the first time filed in the clerk's office of Ulster county, where the mortgagor resided at its date.

On September 28, 1854, Coe obtained a judgment on the notes' against Elmendorf; and on the 28th of November, one against De Meyer. It seems that Shaw must have endorsed the notes, as the action was against him also, but no judgment was taken.

No objection had been raised in any answer that Coe should have been the party to claim upon the mortgage.

At the sale of the vessel, on July 17, 1854, Shaw gave notice of the existence of his mortgage, and of his claim upon it.

On the assumption that John Van Vechten had been an unquestioned *bona fide* purchaser, the inquiry is, What would have been his title as to Shaw?

I understand the effect of the statute (2 *Rev. Stats.*, 365, § 13) to be, that the delivery of a *fi. fa.* to the sheriff creates a lien upon the property afterwards levied upon, from the date of such delivery. This lien may be defeated in various ways, and it is superseded in favor of a *bona fide* purchaser without notice, who becomes such between the delivery and the levy (2 *Rev. Stats.*, 366, § 17; Birdseye *v.* Ray, 4 *Den.*, 160). A mortgagee is such a purchaser (*Ib.*).

But with such qualifications, a regular sale by a sheriff transfers to a purchaser the title of the judgment debtor as it existed on the day of the delivery of the writ.

Two of the executions under which the levy and sale took place, were delivered to the sheriff prior to the mortgage to Shaw, viz., on Jan. 30, 1854. The levy under these and under numerous other executions was made on May 4, 1854. There is no evidence of Shaw having any knowledge of the delivery of the two executions prior to taking his mortgage on the 25th of February.

Therefore, had John Van Vechten been a *bona fide* purchaser, his title, even under these two executions, would be subject to

the mortgage to Shaw, unless the omission to take possession, and to file the mortgage, rendered it invalid. But the purchase being a cover, and the property, as to John Van Vechten, continuing to be that of Elmendorf, and the executions being paid with his money, Shaw had and retained, as against Van Vechten, every right, legal and equitable, which he had as against Elmendorf. And as to the latter, the mortgage was in full force, without possession or filing.

As to John Van Vechten then, the Shaw mortgage was and is unquestionable.

And as to others, Shaw is not prejudiced, upon the principles before stated, by his omission to take possession between the 25th of February and May 25, 1854, when the first notes became due. A question might arise whether the renewal of the notes (provided for in the mortgage) did not extend his exemption until the renewals matured; but that question is probably of no importance in the case. On May 4, 1854, the sheriff of Ulster county levied, and the possession of Elmendorf was changed.

But this mortgage was not filed at all until July 12, 1854, and it will be seen in the opinion of the court, in Hull a. Carnley, that much stress was laid upon the publicity given by the registry under the act of 1833, upon the question of the presumption of fraud under the statute of 1830.

The effect of the filing on the 12th of July was to give to this mortgage full legal force and operation, from the time of such filing, for the succeeding year (at least deducting one day), as against every one, except prior valid mortgages and creditors, as designated in the statute. I apprehend that, so far as the operation of the act of 1833 is concerned, the filing of a mortgage of a previous date renders it a mortgage as of the day of filing, and gives precisely the same force as if it was then dated and filed, as to subsequent purchasers or creditors. As between the parties, the mortgage is valid without possession or filing. There is no requisition of the law that the mortgage must be filed. If not done, creditors or purchasers may get an advantage over it. If filed then, before any creditors or purchasers, capable of questioning it, exist, it must be as available as if filed at its date. (See Swift v. Hart, 12 *Barb.*, 524; opinion of Senator Verplanck in Smith v. Acker, 23 *Wend.*, 470.)

Assuming, for the present, that filing is requisite under the act of 1833, although the possession is not in the mortgagor, but in another person, Shaw's position, from July 12, 1854, to July 11, 1855, seems unassailable, and his rights clear, as against every claimant, whose demand or title arose between these dates. The possession of the sheriff from the 4th of May to the 17th of July, of John Van Vechten, the coroner and the sheriff of New York, relieved him from the consequences of not taking possession, and his mortgage remained on file for the period mentioned. The presumption of fraud under the one statute is repelled, and the other statute was complied with.

But besides this, as to the plaintiff, he had actual notice of Shaw's mortgage, before he took his own; he had seen the enrolment at the custom-house, and conversed with Shaw about it. He relied upon its being invalid, because it had not been, as he thought, duly filed, and that ground fails him.

As to Griffiths, he is prevented from questioning it, by reason of the loss of his lien before noticed.

As to the Westchester County Bank, the course of reasoning before pursued in relation to the Drew mortgage and the claim of the bank, applies to this mortgage. Treating the bank most favorably as creditors on June 10, 1854, they were not creditors at any period when Elmendorf, the mortgagor, was in possession, and cannot impeach Shaw's mortgage for neglect of the statutory provisions, any more than they can do that to Drew.

But between Shaw and Elmore, the question is different. I understand the latter to be unaffected by any actual notice of the mortgage of the former. He was a *bona fide* purchaser on September 15, 1855; promptly filed his mortgage in the proper county; registered it in the custom-house, and immediately proceeded to take possession.

The question, I believe, is new, and it is, Whether, when a mortgagee is exempted from the necessity of taking possession under the statute of 1830, he must yet file and refile his mortgage to prevent the priority of a subsequent mortgage, given by the vendee of his mortgagor? It is to be assumed also that such vendee appears to be the ostensible owner on the records, and that his mortgagee is a *bona fide* purchaser.

I have come to the conclusion that such refiling is necessary. It is manifestly within the terms of the statute, and it is equally

clear, that publicity by the registry is the only method (possession being dispensed with) of guarding subsequent purchasers. (See Fox *v.* Burns, 12 *Barb.*, 677.) The subject, however, is more fully entered upon, and my reasons given, in the consideration of Schoonmaker's claim next stated.

The result is, that Elmore's mortgage must take precedence of Shaw's.

There arises an embarrassing question as between Shaw and Schoonmaker. The demand of the latter thus arose :—

By an instrument of January 9, 1854, Nicholas Elmendorf purchased of Schoonmaker all his title and interest in the boats and property of the firm of William Martin & Co. The consideration was an agreement to repay Schoonmaker the full amount of all the advances and payments made by him for the use of such firm, or towards the purchase of any of its property with the rest, after deducting moneys received by him on account of the firm. Elmendorf was also to indemnify Schoonmaker against all the debts of the firm, and all liabilities incurred by him on account of the firm, or in the purchase of its property. The aforesaid payment was to be made in one year from the date of the instrument. There was a subscribing witness to this transfer.

The following memorandum is endorsed upon the paper : " On settlement this day, the amount of advances of M. Schoonmaker over receipts is $16,488.59, besides interest. January 8, 1854. M. Schoonmaker, N. Elmendorf." The instrument of transfer is proven by the subscribing witness before a justice of the peace on March 24, 1855. Mr. Westbrook proves the handwriting of the parties to the endorsement, but nothing more.

On March 30, 1855, Elmendorf confessed judgment to Schoonmaker for the sum of $17,931. The statement accompanying the confession is as follows : " The above indebtedness arose on the sale and conveyance by the plaintiff to the defendant of his right, title, and interest in the boats, property, and effects of William Martin & Co., in January, 1854; and I hereby state that the sum above by me confessed is justly due to the said Marius Schoonmaker, plaintiff, without any fraud whatever." This was duly sworn to, and the judgment was entered up on the same day.

On the 12th of April an execution was issued and put into

the hands of the sheriff of New York, and a levy was made under it on April 13, 1855.

I shall first consider the case as if there was nothing to impeach Schoonmaker's position as a creditor by judgment and execution. He was then a creditor prior to the date of Shaw's mortgage, and has duly proceeded to judgment, execution, and levy. He became a creditor while Elmendorf, the mortgagor, was in possession, and thus is within section 6 of the statute of 1830.

As before stated, I consider that Shaw is not prejudiced by neglecting to take possession from the 25th of February to the 25th of May, the period of the running of the notes. And on the 4th of May, the sheriff took possession under the executions. Then followed the successive possessions of John Van Vechten and the officers of the law as before noticed. I consider that even a creditor existing at the date of the mortgage, and subsequently entitling himself to question it, cannot object on account of the failure to take possession in a case like this, when the mortgagor was out of possession, at every period when the mortgagee was apparently bound to assume it.

If it is said that the possession was not changed by the sale in July, but in truth continued to be that of Nicholas Elmendorf, the answers are several. There is not enough in the case to charge Shaw with participating in the fraudulent cover. I cannot say that there is evidence enough to charge him with notice of it. If there is, then there is as much to charge the same information upon Schoonmaker. I think also that Schoonmaker's knowledge of the Shaw mortgage is of consequence in this aspect of the case, although the general rule is, that a creditor, even with notice of a mortgage, may avail himself of the neglect of the statutory requisitions.

But Shaw's mortgage was never filed till July 12, 1854, being dated the 25th of February. In strictness, it should have been refiled on July 11, 1855. In April, 1855, Schoonmaker delivers his execution to the sheriff, who levied, although he refused to proceed to sell without an indemnity.

But I understand the law to be, that the mere delivery of the execution of Schoonmaker to the sheriff, who had previously levied under the executions in favor of the Westchester County Bank, was sufficient to support his lien. (Cresson *v.* Stout, 17 *Johns.*, 116; Birdseye *v.* Ray, 4 *Hill*, 158.)

Thus the question seems to be, Whether, when a mortgage is not rendered invalid by reason of the mortgagee's not taking possession, it is so by reason of a neglect to file it, or to refile it; and this in relation to the same creditor?

No language can be more peremptory or more explicit than that employed in the act of 1833. If there is not an immediate delivery and an actual and continued change of possession, the mortgage must be filed, or shall be absolutely void as to creditors. And yet in the present case, the immediate delivery was not necessary until after the 4th of May. And after that date there was an actual and continued change of possession out of the mortgagor. It deserves notice, also, that there is not a word in either statute necessarily implying that the subsequent and continued possession must be that of the mortgagee. The power to deliver, and to the mortgagee, is presupposed; and if that is not in the immediate power of the mortgagor, the mortgage is valid without it.

But the construction of the two statutes as fixed by the courts is, that the filing under the act of 1833 is not a substitute for the taking of possession—does not enable the mortgagor to continue it. The statute only adds a new substantive ground upon which the mortgage must be declared void, if it is not followed. The result of the cases seems to be, that if the mortgage is duly filed, the mortgagee is placed in a position to excuse his omission to take possession; if not filed, he cannot be admitted to explain it. See the statement of the rule and cases by Justice Paige, in Otis *v.* Sell (18 *Barb.*, 108).

That case decided, that the assertion of a right of control by advertising the property for sale before an execution was delivered to the sheriff, dispensed with the necessity of refiling a mortgage, which strictly ought to have been refiled before the delivery of the execution. But the mortgage was duly on file at the time the debt was contracted, and when the judgments were obtained.

It should also be noticed, that the Legislature, in the statute of 1833, forebore to adopt the qualified language of the Revised Statutes, as to the presumption of fraud being capable of being repelled. The mortgage shall be absolutely void unless filed, and shall cease to be valid, unless refiled.

It is consistent with a literal, intelligible, and, I think, bene-

ficial construction of the statute of 1833, to hold, that it covers every case in which the possession is not placed in the mortgagee. If he has no excuse for neglecting to take possession, still the omission to file furnishes a summary and decisive answer to his claim. If he has such an excuse, then the law demands, that the publicity which is not given by possession, shall be given by the record.

Yet, the case of Swift *v.* Hart (12 *Barb.*, 330) is nearly an express decision against this view. Snow gave to Disbrow a chattel mortgage, dated September 17, 1846. It was filed in the proper clerk's office on the 18th of September. On February 1, 1848, it was refiled, with a proper endorsement. No change of possession had taken place. On April 7, 1848, the sheriff received an execution in favor of certain judgment creditors, under which he levied upon the property about the day of its reception. The judgment was upon a demand which arose before the execution of the mortgage. The court held (Justice Johnson dissenting) that the mortgage was valid against the execution creditor. Actual fraud was negatived by the verdict of a jury.

Now, if the reception of the execution was the ground of the right of the creditor to assail the mortgage, then the decision would not be inconsistent with the rules of law I have supposed to exist. The refiling was equivalent to an original mortgage, and at that time there was no execution creditor. But if the view before presented is correct—if a creditor at large, being such at the date of the mortgage, is contemplated by the act (his proceeding to execution being only a mode of relief)—then this decision is irreconcilable with the result I have arrived at.

There is, however, an important distinction between the present case and that of Swift *v.* Hart. Supposing the original omission to file is not fatal, yet the mortgage ought to have been refiled in July, 1855; and then Schoonmaker was an execution creditor with a lien upon the vessel. I repeat, that I am now assuming that there is nothing to invalidate his claim. If not, I consider that he is entitled to a priority over Shaw.

I am, then, brought to the consideration of his claim. First, Although the signatures to the endorsement upon the instrument of January 9, 1854, are proven, yet no evidence is given as to the time of its execution, or as to any items composing it. It

purports to be a liquidation of Schoonmaker's advances, and is dated January 9, 1854. Nicholas Elmendorf was called as a witness, and neither did Schoonmaker question him to sustain, nor did any one else to impeach it.

Next, The proof which was made on March 24, 1855, by Martin, the subscribing witness, does not extend to this endorse- · ment. There was no subscribing witness to that.

And again, I consider the confession of judgment to be insufficient within the code. It is merely that the indebtedness arose upon the sale, and conveyance by the plaintiff to the defendant of his right, title, and interest in the property, boats, and effects of Martin & Co., in January, 1854. This vague generality of specification is not, I apprehend, sufficient. It is not averred that this was an arbitrary price, agreed upon as between original contracting parties for a purchase. It is no way shown how the amount was arrived at, if it was something else than such a purchase. A mere statement that the debt was for goods sold at a particular time could not be enough, and this is even more indeterminate and loose.

I have gone over the leading cases under the act of 1818 (Lawless v. Hackett, 16 *Johns.*, 149; Brinckerhoff v. Marvin, 5 *Johns.*, 325); and the following cases under the Code—Chappell v. Chappell (2 *Kern.*, 215), Stebbins v. The E. Society of the M. Ep. Church (13 *How. Pr. R.*, 410), Davis v. Morris (21 *Barb.*, 132), Moody v. Townsend (3 *Abbotts' Pr. R.*, 375), and Gaudall v. Finn (23 *Barb.*, 652). The last is a decision at special term merely, but it appears to me to be marked by very sound reasoning. These cases, in my judgment, warrant my result, that the confession is insufficient.

It has been assumed, in this opinion, that the executions in favor of the Westchester County Bank were not dormant. That point was much contested, and is one of no little bearing upon many of the questions in the cause.

The judgments were recovered in March; the executions delivered, and the levy made, about the 17th of that month. The sheriff was instructed by the attorney of the plaintiffs to go down and levy upon the Alida. He informed Elmendorf that he could not consent to the boat making her trips. She was in the hands of the sheriff, and if the sheriff saw fit, he would not object. He swears that he never told Cornell that the boat

might go. It is true, Cornell swears that he was told to tie up the boat, maintain the levy, and let her slide. An advertisement was made, under the levy in September, for a sale of the boat. The boat continued her trips. On August 15, 1855, the attorneys wrote to the sheriff, stating that they had given the defendant sufficient lenity, directing him to apprise Elmendorf that, unless the money was paid promptly, the boat would be locked up and sold. Prior to this date the sum of $7,800 was paid upon the executions and endorsed. The payment was to the bank, or their attorney.

The leading cases which I have examined are Kimball *v.* Munger (2 *Hill*, 304), Hunne *v.* Bernard (5 *Ib.*, 377), The Herkimer County Bank *v.* Brown (6 *Ib.*, 232), Sterling *v.* Van Cleve (7 *Halstead*, 288), and Lovich *v.* Crowder (8 *Barn. & C.*, 182).

The statement of Ch. J. Kirkpatrick of New Jersey, in Cocher *v.* Peterson (7 *Halstead*, 91), expresses the true rule, as I understand it. If the execution should not be pursued, and a subsequent one should be levied on the same property, then it will always be a question whether the first was merely kept up by color and for fraudulent purposes.

This present appears to me to have been a case of acquiescence, not of positive interference. It may be observed, also, that even if these executions lost their legal force as against the subsequent mortgagees, yet their dormancy would not prevent the lien of Schoonmaker's execution, even without a levy. The case of Peck *v.* Tiffany (2 *Comst.*, 451) settles this.

There remains one point to be considered. I have found that Shaw is entitled to a priority over the Westchester County Bank, and that Elmore has a right superior to that of Shaw. But it is quite clear, upon the principles of any decision, that the Westchester County Bank has a priority over Elmore. How is the fund to be distributed upon these results?

I consider that Shaw's superior claim as against the bank, which would exhaust the fund, displaces the claim entirely. Thus, then, the question remains merely as between Shaw and Elmore. The latter has the preferable right for his $1,000. There is no just reason for subrogating the bank in Elmore's place as against Shaw, nor Shaw in the bank's place as against Elmore. The simple view I have taken is, I believe, the true one.

The plaintiff's mortgage was dated on March 21, 1855, filed in the custom-house the same day, but was never filed in Catskill, the residence of the mortgagor, John Van Vechten. The clause in the mortgage as to payment and sale in default should be set forth. There is not the usual clause as to retaining possession by the mortgagor, but the period of the running of the notes, September 15, 1855, is recited.

The plaintiff took possession about September 26, 1855. After great hesitation, I have considered that there was usury in the plaintiff's mortgage, but I have also concluded that neither Schoonmaker nor Griffiths can take advantage of it.

Schoonmaker was a creditor of Nicholas Elmendorf, long before Griffiths became a creditor of John Van Vechten. Griffiths cannot be allowed to say that John Van Vechten was a *bona fide* purchaser; and the confession of judgment to Schoonmaker, though void as to others, was perfectly good as to Elmendorf. I think this gives Schoonmaker a preference over Griffiths.

The few facts connected with Griffiths' claim are these:

On the sale on July 17, 1854, he took for the purchase money the note of John Van Vechten, endorsed by De Meyer, for the sum of $19,000. Gradually this was reduced by payments to the execution creditors of their judgments, until about the sum of $4,500 remained. He sued for this balance, and recovered judgment in the month of November, 1854. His execution was placed in the hands of the coroner, who levied in November. The boat was carried to New York in December. She returned in the spring, and Griffiths' acts and directions to the coroner amount to an actual abandonment of the levy, even supposing a new and unequivocal one was not necessary.

The judgment will be drawn up and settled from the above results.