Where a vessel was insured *at and from New-York to Havanna,* and she set sail on the voyage, about 9 o'clock A.M. on the 25th *December,* and just before she got under weigh, the *pilot* heard that an embargo had taken place; and the ship, before she got out of port, was stopped and detained by virtue of the embargo act of the 25th *December;* it was held, that the voyage having commenced before the detention, the insurer was liable for a total loss; that a vague rumour or knowledge by the pilot of an embargo, was not sufficient to charge the insured with a knowledge of the act laying an embargo, so as to render the commencement of the voyage illegal.

After an abandonment, which is not accepted by the insurer, the insured remains the *quasi* agent or trustee of the insurer, and must do what he thinks most for the interest of the concerned; and if he acts with fidelity, and sells the vessel or property insured, at public auction, in the usual manner, without a view to his own benefit, it is no waiver of the abandonment, nor will it prejudice his claim against the insurer for a total loss.

WALDEN and WALDEN *against* THE PHŒNIX INSURANCE COMPANY of NEW-YORK.

THIS was an action on a policy of insurance, dated the 18th *December,* 1807, on the ship *Manchester, at and from New-York* to *Havanna,* valued at 10,000 dollars, warranted not to abandon, if detained or captured, until after a detention of six months. The cause was tried before Mr. Justice *Spencer,* at the *New-York* sittings, the 7th *June,* 1809. The ship set sail on the morning of the 25th *December,* and while proceeding on her voyage out of the harbour of *New-York,* she was, on the same day, stopped, at the *Narrows,* (which form the mouth of the harbour,) and brought back by the authority of the government of the *United States,* under the act of congress for laying an embargo.

The pilot of the ship testified, that the ship sailed about 9 A. M. of the 25th *December;* that shortly before she got under way, he had heard from another pilot, that there were handbills out, stating that an embargo had taken place; that the cargo was all on board, and the ship in the usual state of preparation for sea; that he had been engaged, two days before, to pilot the ship out, and was on board that morning just after sunrise.

The following letters between the plaintiffs and the defendants, which were read at the trial, were admitted to have been received by the parties to whom they are respectively addressed, at the times they bear date.

" *New-York,* 26th *December,* 1807.

*President and Directors of the*
    *Phœnix Insurance Company,*

Our ship *Manchester, Bunker,* master, upon which, with cargo, insurance was made in your office, on the

18th inst. was yesterday detained, when going to sea, and, as we understand, under authority of the law laying the present embargo.

" As we shall look to your office, in proper time, for such indemnification as we may be entitled to, we thought it proper to give you notice of these facts, and to add, that we shall be ready to act in concert with you, in any proper measures for the best interests of all concerned.

" Part of the cargo is of a perishable nature, and if the detention should be long, it is probable loss and expense may be saved, by discharging the crew and stripping the vessel. Upon these subjects we shall be glad of your instructions ; without which, however, we shall not, at present, make any alterations in the equipments of the ship.

" Respectfully,

" J. & T. WALDEN."


" 30th December, 1807.

" THE present embargo being indefinite as to time, and from all appearances not soon to be removed, it is our opinion that it would be for the benefit of all concerned in our ship Manchester, to discharge a great part of the crew, to have her sails unbent, and such other arrangements as to her rigging, &c. as may tend to the safe preservation of those articles. And also to take out and sell the small part of the cargo consisting of flower, to prevent loss by damage in keeping. But this is not proposed, by way of breaking up the voyage, which it is still our intention to pursue, if the embargo be taken off, within the six months from the detention. Upon these subjects, however, we wish your instructions, which we hope to receive within four or five days. Should we receive no answer to this within that time, (as we have been favoured with none to our last of the twenty-sixth inst.) we shall consider you as agreeing to

the propriety of what we have here proposed, and shall alter the equipment and state of the ship and cargo accordingly.

"Respectfully yours,

"J. & T. WALDEN."

, "25th June, 1808.

"OUR ship Manchester, upon which insurance is made in your office, has now been detained here by the embargo the full term of six months; accordingly we hereby abandon to you all our right and interest in the said ship, her tackel, apparel and furniture, and claim a total loss on the policy issued at your office, dated 18th Dec. last.

"Yours,

"J. & T. WALDEN,
"A. & J. BUCKLEY."

"29th June, 1808.

"WE addressed you on the 25th inst. and abandoned to you all our right and interest in the ship Manchester, which we now confirm. We think it proper to add, that we are ready at any time to do such further acts as you may think expedient, for vesting the title of said ship in yourselves.

"Some of the furniture and provisions having been stored for preservation during the detention, we hand you herewith a list of such articles, stating where stored, and which are included in the abandonment of the ship.

"We also hand you herewith the protest of captain Bunker, and an affidavit proving our citizenship, our interest, our loss, and the insurance we have effected.

"The ship now lies in good order at the first wharf eastward from Old Slip, and to preserve her, will require

attention and expense.  We therefore hope you will think proper immediately to take her into your possession.

"Yours,

"J. & T. WALDEN,
"A. & J. BUCKLEY."

"26th July, 1808.

"WE wrote you on the 25th and 29th ult. regarding ship *Manchester*, insured in your office, and detained by the embargo, to which refer.  The present is to suggest for your consideration the propriety of selling that ship (with every thing appertaining to the vessel) at auction, to the highest bidder, for the benefit of those interested, without prejudice to the rights of either.

"The present condition of the ship and her stores requires that something should be done promptly for their preservation; and a sale at auction appears to us the most eligible, under existing circumstances.  We shall be pleased to receive your opinion, and to confer with you on the subject, if necessary.

"Very respectfully,

"J. & T. WALDEN."

"*Office of the Phœnix Insurance Company
of New-York, 30th July,* 1808.

"*Messrs. J. and T. Walden,*

"GENTLEMEN,

"WE have no directions to give relative to your proposal to have the ship *Manchester* sold.

"As far as regards the necessary measures for the preservation of the vessel, we have no objection thereto, for the benefit of whoever it may concern, and without prejudice to our present legal rights.  It being expressly understood, that by this consent it is not intended to

ALBANY,
Feb. 1810.

WALDEN$
v.
PH. INS. Co.

adopt or sanction any circumstances already taken place. On the contrary, it is in nowise to affect the legal questions now existing in relation to your claim on the company.

"With respect,

"WALTER BOWNE, *President.*"

"*New-York*, 12th *August*, 1808.

" *To the President and Directors of*

Phœnix Insurance Company.

" GENTLEMEN,

" REFERRING to our letters to you respecting the ship-*Manchester*, we have to regret that you had not thought proper either to accept the abandonment, to concur with us in the measures we have proposed for the interest of all concerned, or to suggest others.

" We consider our abandonment of the ship, with the other measures of which you have had notice, as putting an end to any duty on our part, to bestow care and expense upon her preservation, for an unlimited time ; and being obliged to act, without your advice, we have determined to sell her. The enclosed advertisement will indicate to you the time and place of sale, and you will be able to prevent the property being struck off, at an incompetent price.

" We shall hold ourselves accountable to you for the net proceeds ; but should you think proper, at any time, before the sale, to accept the abandonment and adjust the loss, we shall be ready to make you a regular transfer of the property.

"J. & T. WALDEN,

"A. & J. BUCKLEY."

It was proved, by an officer of the custom-house, that the cargo of the *Manchester* was unloaded between the first and 7th of *August*, 1808, by a permit from the

custom-house, obtained at the instance of the plaintiffs ; and the salt, which composed most of the cargo, was delivered to *William Todd*, who had purchased it.

*Todd* testified, that he agreed with the plaintiffs for the purchase of the salt, about the 21st *May*, 1808, and that salt had risen in price about twenty cents since the embargo ; but a part of this cargo was dirty, and a deduction was made on that account.

After the expiration of six months, when the defendants were applied to, to know whether they would accept the abandonment, the president of the company answered, that they would not, and that time would determine, whether they were bound to accept it.

The ship was sold at auction, on the 18th *August*, for the account of the underwriters, pursuant to a public advertisement for that purpose ; and she was purchased by a person who was in the employment of the defendants.

The collector of the port of *New-York* received notice of the embargo, by the post, between 9 and 10 o'clock, A. M. of the 25th *December*, 1807, after the *Manchester* had sailed ; and an officer was sent by the collector, about 10 minutes before 10 o'clock, to stop all vessels that were sailing, and he brought back the *Manchester*.

The jury found a verdict for the plaintiffs for 11,208 dollars and 26 cents ; but the judge reserved the question, whether the detention in this case was a sufficient cause of abandonment, so as to entitle the plaintiffs to recover.

*Hopkins*, for the plaintiffs. 1. After the able argument of yesterday,(*a*) on the principal question, as to the

(*a*) See page 299. Notwithstanding the decision of the court in the case of *M'Bride* v. *The Marine Insurance Company*, as to the effect of the embargo, on the contract of insurance, it has been thought best to state the argument of the counsel, also, in this case, so as to present a more complete view of the authorities and reasoning on the subject.

ALBANY,
Feb. 1810.

WALDENS
v.
PH. INS. Co.

* 1 Term Rep.
127.

† Malyne's Lex
Mercatoria,
110, 111.

‡ Le Guidon,
c. 7. § 1. See
Us. et Coutumes
de la Mer, part
2. p. 234.

§ Le Guidon, c.
9. § 6 & 7. c. 7.
§ 6.

¶ Ordon. de la
Marine, Art. 52.
** Valin's Com-
ment. v. 2. p.
134, 135.

effect of the embargo, on the contract of insurance, I shall content myself with making one or two observations, and citing some authorities, chiefly those of *France.*

Prior to the case of *Robertson* v. *Ewer,** no idea appears to have existed of any difference between a domestic and a foreign embargo, as to its effect on the contract of insurance. By the law-merchant, as existing in all commercial countries of *Europe,* a domestic embargo, is a sufficient ground for an abandonment. *Malyne,* in his *Lex Mercatoria,*† observes, that the insured may abandon in case of an embargo ; and he instances the frequent embargoes in *Spain* and *Portugal,* on the departure of the *West India* fleet, or the *Carracks* for the *East Indies.*

The author of the treatise entitled *Le Guidon,* lays it down, that the insured may abandon whenever the ship is detained in port, by the authority of the prince, or the government, to which the vessel belongs, or a foreign prince : *quand il y a prise d'amis ou d'ennemis, arrest de prince, ou autre tel destourbier en la navigation,*‡ &c. He afterwards observes, that the insurer is not bound, when the arrest happens in the same port where the vessel loads, because this is a *land risk, (danger de la terre,)* proceeding from the will of the prince ; but it seems to be admitted, that if the vessel departs from the loading port, and returns again to the same port, or is driven into another port of the kingdom, where she is detained, by an arrest of the prince, the insured may abandon,§ after waiting six months, unless the goods are perishable ; in which case, the abandonment may be made immediately, or in six weeks. The *French* ordinance says, if the vessel is arrested by order of the king, in one of the ports of the kingdom, *before the voyage is commenced,* the insured cannot abandon, on the ground of such *arrest.*¶ *Valin,**** in commenting on this article, distinguishes between arrests made by the king of *France,*

3

in the ports of his kingdom, and those made by a foreign prince ; and he adopts the distinction made by the author of *Le Guidon*, between an arrest made in the loading port, and an arrest in any other port where the ship puts in, after the voyage has commenced. But *Pothier*[*] and *Emerigon*[†] contend, that when the article of the ordinance says, an abandonment cannot be made, because of an arrest, in one of the ports of the kingdom, *before the commencement of the voyage*, it follows, *à contrario*, that when the arrest is made *after* the commencement of the voyage, though by order of the king, and in one of the ports of the kingdom, an abandonment may be made, as in other cases of arrests in foreign ports, by foreign princes ; and they reject the distinctions taken by *Valin*. There can be no doubt, that this is the plain sense, and just construction of the ordinance ; and the reason of the distinction in *Le Guidon*, that an arrest before the departure of the vessel is not a *sea* risk, is explained by considering the words, *commencement of the voyage*, as meaning the voyage insured, which does not commence, unless otherwise expressed in the policy, until the vessel actually sets sail, or *departs*. And in such case, the commencement of the voyage, or departure of the vessel, and the commencement of the risk, mean the same thing. It is clear from an attentive examination and comparison of all these writers, that where the arrest happens, after the risk has commenced, the insured may abandon ; and, by the terms of the policy, or contract of insurance, the *risk*, or *voyage insured*, may commence before the actual departure of the vessel, from the port.[‡]

*Roccus*[§] lays it down, that the act of a prince is one of the accidents, or risks, for which the insurer is liable ; and that if a vessel, loaded and ready to sail, should be detained, by order of a prince, so that the vessel could not proceed with her cargo to the port of

ALBANY,
Feb. 1810.

WALDENS
v.
PH. INS. Co.

[*] *Poth. Trait. d'Ass.* n. 59, 60.
[†] *Emerig.* v. 1. p. 541.

[‡] *Emerig.* v. 1. p. 341. 344.
[§] *Roccus*, note. 65. See also, n. 54. 6 *Term Rep.* 416. *Marshall*, 2d ed. 510, 511. *Park*, 6th ed. 102.

ALBANY,
Feb. 1810.

WALDENS
v.
PH. INS. Co.

destination, the insurers would be liable.(*a*) The rule of law must, then, be considered as settled, that if a vessel be insured, *at and from* a certain port, a detention by public authority in that port, is a detention within the words of the policy, for which underwriters are answerable.

But it will be said, that as the insured are citizens of the *United States*, they must be considered as parties to, and assenting to the act of congress laying the embargo, and cannot, therefore, take advantage of their own act or default. This reasoning is very artificial and speculative. A general law, in general terms, does not affect or destroy private contracts.*

\* 2 *Mod.* 310.
2 Ld. *Raym.*
1350. 11 *Mod.*
315. *Com. Dig.*
*Parl.* (R. 27.)
19 *Vin. Abr.*510.
518, 8 *Co.* 118.

[KENT, Ch. J. You need not argue on that point. The reason appears to be too fanciful to be allowed any weight in the cause.]

Again, it may be said that this contract is rendered illegal by the act of congress. But it was made on the 18th *December*, before that act passed; and suppose, that on the 26th *December*, after the embargo was known in *New-York*, the vessel had been accidentally consumed by fire, could not the plaintiffs have recovered on the policy, for a total loss? It cannot be denied, that the policy was a legal and subsisting contract, and valid, at least, as to every other risk and peril enumerated in the policy.

It is not necessary, in order to render the insurers liable, that the arrest should be unlawful or wrongful. They are answerable for lawful as well as unlawful

(*a*) *Regis et principis factum enumerantur casus fortuitos, ideo, si rex et princeps retineant navem oneratam frumento, ex causa penuriæ, quapropter navis non potuerit frumenta asportare ad locum destinatum, tenentur assecuratores.*

*Baldus,* he adds, was of a different opinion, but that writer, he thinks, is rather confused in his ideas on the subject.

seizures and detentions.\* Suppose a neutral carrying the goods of an enemy, is captured and condemned by one of the belligerents, as by the law of nations a belligerent may do, the insurer would nevertheless be liable.

Again, how can it be said that the contract of assurance is dissolved by the embargo? The defendants have received their full premium; and the policy must be considered as valid and subsisting, as to every purpose and peril, except sailing during an embargo. The insured does not undertake to sail at all events, but only in case they can lawfully depart; and the insurers engage to indemnify the insured, if they cannot lawfully proceed on the voyage insured, whereby it becomes defeated.

2. In the case of *Abbot* v. *Broome*[†] it was decided, that after an abandonment and refusal, the insured might sell the vessel, at public auction, for the benefit of the insurer, without being considered as waiving his right under the abandonment. The vessel was not sold until after six months, and a month's notice of the intended sale. The plaintiffs being owners of the cargo as well as the vessel, it became necessary to unload the cargo, in order to sell the vessel. It may, perhaps, be said, that the freight of the goods ought to have been tendered to the defendants. But if the goods had belonged to third persons, instead of the plaintiffs, a tender to the insurers would not have discharged the shippers. The plaintiffs were the only persons to whom a tender of freight could have been made.

It cannot be said that the vessel violated the law by sailing, or that the plaintiffs knew of the law at the time of her sailing; for there is no evidence of that fact.

*Hoffman* and *Emmet*, contra. After the argument of yesterday, it is unnecessary to say much on the first point. The voyage having commenced after the act lay-

ALBANY,
Feb. 1810.

WALDENS
v.
PH. INS. Co.

\* *Roccus de Assec.* n. 54. 65.

† 1 *Caines*, 292.
1 *Esp. Cas.* 237.

ing an embargo had passed, and a knowledge of it had reached *New-York*, the sailing was illegal, and the insurers are not answerable. It makes no difference whether the plaintiffs knew of the act; for, in contemplation of law, it takes effect from the day it was passed, and every citizen is presumed to have knowledge of it. But admitting that the act could not have effect, until known, there is evidence that the pilot and master knew of the embargo, and the owner must be bound by the act of the pilot or master, as his agent, and whose duty it was, having heard of the law being in force, to ascertain the truth of the report. The attempt to sail, after this information, was at his peril. Suppose the vessel, having evaded the embargo, had been, afterwards, captured, would the defendants have been liable, when the voyage had illegally commenced ?\* If the evasion of the embargo would be a good defence in such a case, it is equally so in the present case.

\* 4 *East*, 410. 8 *Term Rep*. 562. *Park*. 8th ed. 310, 311.

Judge *Washington*, in the case of *Odlin* v. *The Pennsylvania Insurance Company*, says, " that by a violation of the embargo, the insured would lose the benefit of the policy, as much as by a breach of an express warranty." There is no hardship in this ; it encourages obedience to the law, at the same time that it discourages any attempt to violate it. According to principles of sound policy, as well as justice, therefore, the plaintiffs ought not to be allowed to recover.

2. The acts of the plaintiffs amount to a waiver of the abandonment. The party electing to abandon, must abide by his election, until it is waived by mutual consent. By the abandonment, the rights of the parties are fixed ; and the property in the vessel is transferred to the insurers. The defendants then became entitled to the *freight*. Whether the insurer accepts the abandonment or not, if the insured has a right to abandon, the insurer becomes the owner of the vessel, from the time of abandonment, and is entitled to all her earnings.

The insured can do no act to impair the rights of the insurer.* If the insured does any act inconsistent with the abandonment, or which impairs the rights of the insurer, it amounts to a waiver of the abandonment. By taking out and selling the cargo, the plaintiffs destroyed the *lien* which the defendants would have had for the freight. By a voluntary delivery of the goods to the shippers, the claim for freight is relinquished. The owners of the cargo would not be entitled to demand their goods and break up the voyage, without first paying the freight.† The plaintiffs entered into an agreement for the sale of the *salt*, thirty days before they had any right to abandon, according to the terms of the policy, and it was delivered, afterwards, pursuant to that agreement. This was also, at least thirty days before their letter of the 25th *July*, in which they speak of the necessity of selling the vessel. That agreement is a very important fact, to show that the plaintiffs acted as owners and principals, and not agents.

Again, the sale of the vessel was also a waiver of the abandonment. The defendants did not consent to the sale. Their answer is a refusal of such consent; and they express their willingness to pay whatever expense may be requisite for the preservation of the vessel, for the benefit of all the concerned. The power of the insured to sell after an abandonment, ought to be restrained and limited as much as possible, since the exercise of it may lead to great fraud and injustice. The insured, after an abandonment, becomes an agent from necessity, and can do nothing but what is absolutely necessary. He can sell only, when by keeping the property he will be involved in expense. Every act of the insured, without necessity, must be considered as an act of ownership, and waiver of the abandonment. In the present case, there was no occasion or necessity for the sale; and the insurers being on the spot, it was the duty of the insured to consult them, and to follow their directions. They

ALBANY,
Feb. 1810.

WALDENS
v.
PH. INS. Co.

* 3 *Bos.* and *Pull.* 479. & *East*, 34.

† *Abbott*, 405.

were willing to contribute to the expense of keeping the property ; but refused their consent to its sale. As agents, therefore, the plaintiffs acted without necessity, and without authority. The sale must be considered as the act of owners, not of agents. If the embargo was temporary, as has been contended, the plaintiffs ought not to have sold the vessel, as they thereby prevented the defendants from proceeding on the voyage, after the embargo was removed.

In the case of *Abbot* v. *Broome*, the insurers were silent and passive. The vessel was condemned in the *West Indies*, as not worth the expense of repairs, and the voyage was at an end. The circumstances of that case are materially different from those of the present. Here there could be no implied assent or authority to sell, as both parties were on the spot, and the defendants refused their consent.

*J. Radcliff*, in reply. It is unnecessary to add any thing further on the right of the insured to abandon, in the case of a *domestic* embargo. Whether this was an embargo, or a prohibition of trade, or whether the act was unconstitutional and void, can make no difference ; for the plaintiffs, in either case, are entitled to recover.

A person acting without notice of a law, cannot be punished for acting contrary to that law. This would be against the first principles of justice. A knowledge of the law by the plaintiffs, ought to have been clearly shown. The pilot does not say that he communicated what he had heard from another pilot, to the plaintiffs, or even to the master. Such a mere rumour, or hearsay, is not legal notice. The act contained many exceptions ; and could the pilot know the nature and extent of these exceptions, or whether the act applied to vessels which had previously obtained regular clearances ?

It does not appear that the agreement for the sale of the salt was absolute and unconditional. It may have

been made, *cum onere.* It was entered into from an expectation that the abandonment would not be accepted. The rights of the defendants could not be prejudiced; for there was no delivery until after the abandonment; and the defendants had it in their power, by accepting the abandonment, to enforce and secure all their rights under it.

The defendants refused to accept of the abandonment. Were the plaintiffs, then, bound to keep the property for an indefinite period of time ? That would prove extremely inconvenient and injurious. It would, in a great degree, defeat the object of the contract of insurance. Being an agent for all concerned, the most that can be required of the insured is, that he acts *bona fide*, and does what a reasonable man would do, under similar circumstances.

The case of *Abbot* v. *Broome* has settled the point, that the insured, after an abandonment, may sell the property, and account to the insurers for the *nett proceeds.*

THOMPSON, J. delivered the opinion of the court. The judgment pronounced in the case of *M'Bride* v. *The Marine Insurance Company*, decides, that a detention, under the authority of the *United States*, by virtue of the act laying an embargo, is a peril within the policy, and authorized an abandonment ; this disposes of one of the questions made in this case. Two other objections, however, have been urged against the plaintiffs' right to recover for a total loss :

1. That the voyage was begun with a knowledge of its being illegal, and prohibited.

2. That the abandonment was waived by a sale of the ship and cargo.

These objections, I think, cannot prevail. The policy was effected the 18th of *December*, 1807, on the vessel, at and *from New-York* to *Havanna.* The risk had ac-

ALBANY,
Feb. 1810.

WALDENS
v.
PH. INS. Co.

cordingly commenced before the passing of the act, and the defendants' right to the premium had become fixed. The rumour, on the morning the ship sailed, of an embargo having taken place, as stated by the pilot, was too vague and uncertain to be obligatory upon the plaintiffs, so as to subject them to the consequences of an intentional violation of the embargo, which would have been a criminal act. But another conclusive answer to this objection is, that the plaintiffs are not chargeable with any information which the pilot might have on this subject. He was not such an agent as to make his acts the acts of the assured. He was only employed for the specific purpose of conducting the vessel out to sea, and had no control or direction as to the time of sailing. This belonged to the master or owners ; and there is no evidence of any knowledge of the embargo being brought home to either of them.

2. The agency which the assured took in selling the ship, ought not to prejudice their claim on the underwriters. The plaintiffs had a right to abandon ; and the law will charge the defendants with a knowledge of that right ; they, therefore, ought to have accepted the abandonment. By an abandonment, the assured yields up to the underwriters all his right, title, and interest in the subject ; it operates, in judgment of law, as a transfer of the property ; (*Marsh.* 509.) and puts the insurer in the place of the assured. (2 *Caines*, 284.) If the underwriter will not accept the subject, there is no mode of compelling him to receive it. The assured then, by operation of law, becomes actually possessed of the property of the underwriters. He is necessarily left to act, *quasi* agent or trustee, without any instructions from his principal. What is it his duty, under such circumstances, to do ? Would it be proper and discreet in him, to neglect and abandon the property altogether, and leave it to waste and perish ? If not, he must, from the nature of his situation, have an implied authority, to do what he

thinks most for the interest of the concerned. To consider the mere sale of the subject by the assured, for the avowed benefit of the underwriter, after a refusal to accept a rightful abandonment, a waiver of such abandonment would, it appears to me, be against the principles of justice, and sound commercial policy. If this should be considered the rule of law, it must be general, and applicable to all cases; and if the subject abandoned was of a perishable nature, a total loss and destruction of the property must necessarily be the consequence. The assured being made trustee, *ex necessitate*, if he executes his trust with fidelity, it is all the law requires of him. And whatever he does ought to be considered as done in the character which the law has imposed upon him, unless his conduct shows clearly, that he intended to act for his own benefit, and to waive his abandonment. The *quo animo* is the criterion by which his acts ought to be tested. There is nothing appearing in this case to warrant the inference, that the plaintiffs intended to act in any other character than as agents, or trustees, for the defendants.

The circumstances against the assured, in the case of *Abbot* v. *Broome*, (1 *Caines*, 292.) and which were held not to be a waiver of the abandonment, were much stronger than in this. In that case, the great object of the defendant's counsel was to show, that the sale and purchase of the vessel was for the benefit of the assured; and it seemed to be admitted, that unless this was shown, the sale would be no waiver of the abandonment. In the case before us, there is no one circumstance which looks to the conclusion, that the plaintiffs were acting for their own benefit. After the abandonment, they apprized the defendants, that the situation of the ship was such as to require something to be done with her, and proposed selling her for the benefit of those interested, without prejudice to the rights of either. On the defendants' declining to accede to this proposition, they determined to sell the

ALBANY,
Feb. 1810.

WALDENS
v.
PH. INS. CO.

ship at public auction, of which they gave the defend-
ants notice, sent them a copy of the advertisement, and
particularly requested their attendance, to prevent the
property being sold at an under price. The purchaser
was a person in the employment of the defendants.
The auctioneer called at their office for the purchase-mo-
ney. The president of the company made out a check for
the amount; but, on reflection, said he had rather, for
certain reasons, that the purchaser would pay the money
himself. All this certainly looks more like a purchase
for the account and benefit of the defendants than the
plaintiffs. The plaintiffs' letter, of the 26th of *July*,
1808, by a fair construction, contains no proposition,
except to sell the ship for the benefit of whoever it
might concern. And if the defendants wished any other
measures taken for her preservation, it was incumbent
on them, at least to make some specific proposition. The
plaintiffs had confidence in their legal right to abandon;
and, relying on that, they were not bound to make ad-
vances for the preservation of the ship, until the result
of a lawsuit should enforce their claim upon the under-
writers. Under the existing state of things, the selling
of the vessel showed no disposition in the assured,
either to sacrifice the property, or to benefit themselves.
They appear to have acted in good faith, as agents or
trustees for the defendants, without any intention of
waiving their abandonment. I do not see on what pos-
sible ground it can be pretended, that the plaintiffs were
bound to keep the cargo. This was a distinct subject,
with which the defendants, from any thing that appears,
had no concern. The voyage being broken up, and ship
abandoned, the owners of the cargo, whether they were
the plaintiffs or other persons, would not be bound to
leave that to perish. Had the underwriters on the ship
accepted the abandonment, and been entitled to any
lien on the cargo, they could have had the benefit of

that lien, for the cargo remained on board, for a con-siderable time after the abandonment.

I am, therefore, of opinion, that the plaintiffs are entitled to recover, as for a total loss.

<div align="right">

ALBANY,
Feb. 1810.

</div>

<div align="center">

Judgment for the plaintiffs.