Points decided.

## JOSEPH MARTIN, APPELLANT, *v.* MARKS ZELLERBACH, GEORGE POWERS and Others, RESPONDENTS.

CONSTRUCTION OF THE 13TH SECTION OF THE ACT CONCERNING CORPORATIONS.— The prohibition of the 13th Section of the Act concerning corporations is directed against the trustees, and is designed to protect creditors, as such; and, also, to protect the stockholders against their mismanagement in distributing capital stock in the form of dividends.

IDEM.— Any arrangement which will have the effect to withdraw the capital of an incorporated company, and turn it over to the stockholders, except in the manner provided by law, is in violation of that provision of the statute which forbids the trustees " to divide, withdraw, or in any way, pay to the stockholders, or any of them, any part of the capital stock of the company," and is void as to any creditor of the corporation, either prior or subsequent, who had no notice of the arrangement at the time of giving the credit.

CAPITAL STOCK.— By capital stock, the statute intends the capital of the corporation on which it transacts business, whether such capital consists of money, property or other valuable commodities.

THE PERFORMANCE OF ACTS, PROHIBITED BY LAW, WILL NOT BE ENFORCED BY A COURT OF EQUITY. — It may be stated, as a general proposition, that an act which the law prohibits to be done, is in so far infirm, that a Court of Equity will not lend its aid to enforce its performance. To grant any relief, the Court must first decide that the transaction, on which it is claimed, was lawful and valid.

IDEM. — Nor can a transaction, imbued with the fatal infirmity of being in violation of law, be purged of its infirmity by means of an estoppel.

ESTOPPEL. — A judgment-creditor is not estopped from denying the title of the debtor to the property sold, under execution, in satisfaction of his judgment.

IDEM. — The doctrine of estoppel *in pais* proceeds wholly on the theory that the party to be estopped has, by his declarations or conduct, misled another to his prejudice, so that it would be a fraud upon him to allow the true state of facts to be proved.

IDEM. — When invoked in respect to the title of property, to constitute an estoppel it must appear: First—That the party making the admission, by his declarations or conduct, was apprised of the true state of his own title; Second—That he made the admission with the express intention to deceive, or with such careless or culpable negligence as to amount to constructive fraud; Third—That the other party was not only destitute of all knowledge of the true state of the title, but of all convenient or ready means of acquiring such knowledge by the use of ordinary diligence; and, Fourth—That he relied directly upon such admissions, and will be injured by allowing its truth to be disproved.

The case of *Dezell* v. *Odell* (3 Hill, 315), questioned.

Upon Re-hearing:

PRACTICE.—When a case, involving questions of law and of equity, is brought before the Court for trial, without a jury, the more regular and orderly practice is, first, to dispose of the equitable branch of the case.

IDEM.—In such case, it should distinctly appear from the record, that the issues on the equity side of the Court were first tried and disposed of; or, if the whole action and all the issues were tried and submitted together, that fact should appear.

APPEAL.—Whether an appeal will lie from a judgment which determines only the questions of an equitable nature in the case, and leaves all the issues of law wholly undisposed of? *Quere.*

APPEAL from the District Court of the Fourteenth District, County of Nevada.

The case is stated in the opinion.

*A. C. Peachy, S. Heydenfeldt, D. F. Barstow, Edmond L. Goold* and *J. I. Caldwell,* for Appellant.

*J. P. Hoge, A. C. Niles* and *D. Belden,* for Respondents.

CROCKETT, J., delivered the opinion of the Court:

There are certain prominent facts in this case, which are established by the findings, and which, as we understand it, are not controverted by the parties. These facts are:

*First*—That there were two corporations, to wit: "The Eureka Lake Company," and "The Miners' Ditch Company," which were duly organized under the general incorporation laws of this State, for the purpose of supplying water for mining purposes, each of which corporations owned, in severalty, several water ditches, and the two corporations having no interests in common; but the stockholders, officers and managers of both corporations were, to a great extent, the same persons.

*Second*—That, after some discussion in respect to a consolidation of the two corporations, there was a meeting of the stockholders of the Eureka Lake Company, in the spring of 1859, at which meeting all the stock was represented, and the proposition was fully discussed for uniting the two corporations, and it was finally determined, unanimously, by the stockholders, that they would so unite upon the following basis, to wit: That the property of the two corporations should be thrown together, and managed in common, and should be owned in the proportion of two shares to the Miners' Ditch Company and three shares to the Eureka Lake Company, and the President of the Eureka Lake Company was authorized, by the stockholders, to make this offer to the Miners' Ditch Company.

*Third*—That, in May, 1859, at a meeting of the stockholders of the Miners' Ditch Company, at which all the

stock was represented, the proposition of the Eureka Lake Company was formally made and accepted by a formal vote of the stockholders of the Miners' Ditch Company, every vote being in favor of it, except the vote on a few shares, held by one Crandall.

*Fourth*—That, in accordance with this agreement, the two companies commenced to act together, and as one body, on the 20th of June, 1859, and from that time, until the fall of 1860, the property of both corporations was managed by common agents, who had full possession and control of the whole; and the business was conducted in the name of "The Eureka Lake and Miners' Ditch Company." That, during this period, large sums of money were expended in improving the common property—over $35,000 being expended on the ditches of the Eureka Lake Company; that this arrangement was, apparently, only temporary, the intention being to effect, finally, a complete and legal union of the property and business of the two corporations. That, accordingly, in September, 1860, a meeting of the stockholders of the Eureka Lake Company was regularly called for the purpose of acting on a proposal to create a new corporation, to be composed of the members of the two old ones, to which the property of both should be conveyed; at which meeting it was determined that such new corporation should be organized, and that the Eureka Lake Company would convey to it all its ditches and other property, upon the consideration that the Miners' Ditch Company would do the same, and that stock in the new corporation would be credited to the stockholders of the two companies in the proportion agreed upon. Similar action having been taken by the stockholders of the Miners' Ditch Company about the same time, in the following month (October, 1860), in accordance with these arrangements, a new corporation, called "The Eureka Lake Water Company," was duly organized by the stockholders of the other two companies; and, on the twenty-ninth of that month, the Miners' Ditch Company, by a regular deed, conveyed all its property to the new corporation. But, about this time, the members of the Eureka Lake Company were informed by counsel that their

incorporation had never been perfected; that there was no such corporation as the Eureka Lake Company in legal existence, and that the only way they could convey their property was by a deed signed by each member of the company in his individual capacity; and, in accordance with this advice, such a deed, signed by the individual stockholders of the Eureka Lake Company, was executed October 25th, 1860, conveying, or purporting to convey, all the property of the Eureka Lake Company to the Eureka Lake Water Company, and, at the same time, full possession of all the property was given to the Eureka Lake Water Company; from which time, to January, 1863, said company had complete possession and control of the property, claiming it as its own, and no one interfering with or disputing its title or possession. But no deed of conveyance was ever given by the Eureka Lake Company, as a corporation, to the Eureka Lake Water Company; and, in January, 1863, the last named company, for the purposes hereinafter mentioned, gave posession to the defendants, Zellerbach and Powers, who have ever since remained in possession.

*Fifth*—That immediately after the formation of the Eureka Lake Water Company, stock books were opened, and stock of that company issued to all the stockholders of the other two companies in the proportion agreed upon.

*Sixth*—That, after receiving possession, the Eureka Lake Water Company expended large sums in improving the property, and in discharging liens upon it, before then contracted by the Eureka Lake Company.

*Seventh*—That the Eureka Lake Water Company borrowed of the defendants, Zellerbach and Powers, $200,000, at least $90,000 of which was used in paying off liens of the Eureka Lake Company, contracted before the Eureka Lake Water Company was organized; to secure which sum, the last named company gave to the defendants a mortgage upon all the property; in which mortgage it was provided that the defendants might receive and apply the profits and income of the property towards the satisfaction of the mortgage debt; and in order the more fully to carry this provision into effect, the Eureka Lake Water Company, on the 3d of

January, 1863, delivered to the defendants the full possession and control of the property, and they have since retained it under this agreement.

*Eighth*—That on the 2d of February, 1863, the plaintiff brought suit against the Eureka Lake Company to recover money due from said company, and had the property in contest attached ; that, on the 19th of February, 1863, the plaintiff duly recovered a judgment in said action against said company for $9,469 and costs ; that, on the 7th of September, 1863, an execution, under said judgment, was duly issued and levied upon the premises in controversy, as the property of the Eureka Lake Company, being the same property conveyed by the stockholders of the Eureka Lake Company to the Eureka Lake Water Company. And such proceedings were had, that, upon the 20th of October, 1863, the said premises were duly and regularly sold by the Sheriff, under said execution, to the plaintiff for $11,000, and no redemption from said sale having been made within the time allowed by law, the Sheriff, on the 25th of April, 1864, executed and delivered a deed to the plaintiff, in due form, for said premises, conveying to him all the interest, right and title of said Eureka Lake Company in and to said premises. That all said proceedings were regular, and the plaintiff thereby acquired all the title and interest which the Eureka Lake Company had in and to said premises at the time the attachment was levied ; that the said judgment was founded on promissory notes of the Eureka Lake Company to the plaintiff, which were made in the summer and fall of 1861, and that said Sheriff's deed was duly recorded in April, 1864.

*Ninth*—That before the recovery of the judgment aforesaid against the Eureka Lake Company, the plaintiff recovered a judgment against the Eureka Lake Water Company, on a money demand, and caused an execution thereon to be levied upon the premises conveyed by the stockholders of the Eureka Lake Company to the Eureka Lake Water Company, and upon a large amount of other ditch property, including the entire property claimed by the Eureka Lake Water Company, and embracing the Poorman's Ditch, Grizzly Ditch and others, and caused all said property to be

sold under said execution, at which sale the defendants were the purchasers, and now holds the Sheriff's deed therefor.

The foregoing are the main facts included in the findings, and, we believe, are not controverted. But the findings are not very explicit as to the date at which the *debt* accrued on which the plaintiff's judgment against the Eureka Lake Company was founded. As we understand the finding on this point, it merely states that the promissory notes on which the judgment was based, were made in the summer and fall of 1861, but is silent in respect to the fact, whether the *indebtedness* of which the notes were the evidence, accrued at the times the notes were executed and delivered, or existed before.

On these facts, the plaintiff brought his action against the defendants, to recover the possession of the property which formerly belonged to the Eureka Lake Company, and which was conveyed by the stockholders of that Company to the Eureka Lake Water Company. The answer sets up substantially the foregoing facts as an equitable defense, and on the hearing, the District Court entered judgment for the defendants, denying the plaintiff's prayer for relief, and adjudging that the plaintiff be forever estopped, enjoined and restrained from setting up title to said premises, as against the defendants, derived from said Eureka Lake Company, subsequent to the 29th day of October, 1860, at which date the defendants entered into the possession of said premises. The plaintiff made a motion for a new trial, which was denied, and he has appealed as well from the judgment as from the order denying said motion.

On the re-hearing, the cause has been more elaborately argued than on the former hearing; and the able briefs with which we have been furnished by eminent counsel, have presented in a forcible manner the arguments tending to elucidate the important questions at issue.

It is maintained with much earnestness on behalf of the plaintiff, that if the agreement between the Eureka Lake Company and the Miners' Ditch Company, for the consolidation of the two companies, on the terms proposed, had

been carried out in the most formal manner, and into complete execution, by proper and formal deeds of conveyance, duly executed by the two corporations, transferring the property to the new corporation styled the Eureka Lake Water Company, and if there had been a complete and formal delivery of the possession, at the same time, to the last named Company, the transaction would have been wholly void as against the plaintiff, for the following reasons :

*First*—Because it would have violated the 13th Section of the Act of 1853, under which the Eureka Lake Company was incorporated, and which is as follows :

"It shall not be lawful for the trustees to make any dividend, except from the surplus profits arising from the business of the corporation ; nor to divide, withdraw, or in any way pay to the stockholders, or any of them, any part of the capital stock of the company ; nor to reduce the capital stock, unless in the manner prescribed in this Act ; and in case of any violation of the provisions of this section, the trustees under whose administration the same may have happened, except those who may have caused their dissent therefrom to be entered at large on the minutes of the Board of Trustees at the time, or were not present when the same did happen, shall, in their individual and private capacities, be jointly and severally liable to the corporation and the creditors thereof, in the event of its dissolution, to the full amount so divided, withdrawn, paid out or reduced ; *provided,* that this section shall not be construed to prevent a division and distribution of the capital stock of the company, which shall remain after payment of all its debts, upon the dissolution of the corporation, or the expiration of its charter." (Statutes 1853, p. 89.)

*Second*—That the proposed arrangement, if not void because in contravention of the foregoing statute, was void on the ground that in substance it proposed to establish a partnership between the two corporations, and that the law forbids such partnerships between corporations.

We propose to examine these propositions before proceeding to other branches of the case. In considering the first proposition, the first point to be determined is, whether or not the arrangement proposed and attempted to be carried into effect between the two companies, was in violation of

the statute we have quoted. We entertain no doubt that it was, upon the facts as now presented in the answer and found in accordance therewith by the Court.

The policy which dictated that provision is obvious. Persons dealing with corporations do so upon the faith that its property and all its assets, of whatsoever nature, are vested in trustees or managers, to be held by them as a fund which shall be primarily liable for its debts. For although the stockholders, and in some events the trustees, may be individually liable to creditors, it is the property and capital of the corporation to which creditors chiefly look, and which give it credit in the community. To protect the rights of creditors and to guard against improvident or fraudulent conduct on the part of trustees and stockholders, the Legislature has wisely provided in the section we have quoted, that the capital stock of the company shall remain intact, and shall not be devoted to the stockholders, either in the shape of dividends, payments or withdrawal; nor by way of a reduction of the capital stock (unless in the manner provided by law), except on a dissolution of the corporation in the method prescribed by law, nor even then, until "after the payment of all its debts." Dividends can only be declared from "the surplus *profits* arising from the business of the corporation," and it shall not be lawful "to divide, withdraw, or in any way pay to the stockholders, or any of them, any part of the capital stock of the company," except after payment of all its debts, on a dissolution of the corporation. This language leaves no room for construction or doubtful interpretation. It is direct, explicit and unmistakable. But it was not intended to interfere with the plenary power of the trustees over the legitimate business of the corporation. They may manage, control and alienate its property in the regular course of its business, but they cannot devote the proceeds, beyond the surplus *profits*, to the stockholders, either directly or indirectly, until after all its debts are paid.

The transaction, as agreed upon and attempted to be carried out, between the Eureka Lake Company and the Miners' Ditch Company, if effectual in law, would, of necessity, have

resulted in an alienation of the entire property and capital of the Eureka Lake Company to the Eureka Lake Water Company. This is undeniable. Not one dollar of its property or capital would have remained to satisfy the demands of creditors, unless the proceeds of the transaction were to be thus applied. But, by the terms of the contract, the only consideration to be paid was stock in the *new* company. Was this to be paid, or was it in fact paid to the trustees of the Eureka Lake Company, to be held by them as a fund for creditors, and as representing the property conveyed to the Eureka Lake Water Company?

On the contrary, the contract was that this stock was to be issued, and it was afterward issued directly to the *stockholders* of the Eureka Lake Company. It does not vary the principle that the consideration to be paid was stock instead of money. If the contract had been, that on the transfer of the property the Eureka Lake Water Company would pay to the *stockholders* of the Eureka Lake Company $100,000 in cash, as the price of the property, the legal proposition involved would have been precisely the same as in this case. In either case, the consideration would have been paid, not to the trustees as a fund primarily liable to creditors, but to the *stockholders*, for their own use. The result of such a transaction would necessarily be, as it has been in this case, that the corporation would be divested of its entire property, forming its capital stock, whilst the whole proceeds of it had gone into the pockets of its stockholders, leaving no fund for the payment of debts. If this be not a violation of that provision of the statute which forbids the trustees "to divide, withdraw, or in any way pay to the stockholders, or any of them, any part of the capital stock of the company," we are unable to conceive a case which would.

We regret that the learned counsel for the defendants have not discussed this point more fully in their briefs, but we understand their proposition to be, that the statute refers only to the "capital stock of the company," and not to its property. They maintain that the property of a corporation does not necessarily, nor even presumptively, compose a part of its capital stock. We do not so interpret the statute.

On the contrary, we think that when the statute speaks, in the thirteenth section, of "capital stock," and forbids its withdrawal by, or payment to the stockholders, it intends the capital of the corporation on which it transacts business, whether such capital consist of money, property, or other valuable commodities. In no other sense could the term "capital stock of the company," as employed in section thirteen, have any significance.

But, assuming that the transaction in question was in violation of this provision of the statute, it remains to be considered whether it was therefore absolutely void as against the plaintiff, and whether it affords a sufficient basis for the equitable defense set up by the defendants.

It may be stated as a general proposition, that an act which the law prohibits to be done is in so far infirm that a Court of Equity will not lend its aid to enforce its performance. It is not necessary for us to decide whether it is absolutely void under all circumstances, and as against all persons. But it is clear that a Court of Equity will not lend itself to enforce the performance of an act which is positively prohibited by law. That would be not to enforce the law, but to annul it.

In this case, the defendants admit that the plaintiff holds the legal title, but claim that they have superior equities, which entitle them to demand that the plaintiff should be restrained and enjoined from molesting them in the enjoyment of the property.

The foundation of the alleged equity is the agreement between the two original companies to consolidate, and which was attempted to be carried into effect by the deed from the stockholders before mentioned. If that agreement and deed be stricken from the case, the basis of the defendants' equity is gone. It is upon these that they rely to show that their possession is rightful and meritorious, and that they have an equitable title to the property. But, as we have shown, the agreement being prohibited by law, cannot be enforced in equity. It may be said, however, that this is not an action for specific performance, and the defendants only pray that the plaintiff be enjoined from molesting them in the posses-

sion. This is true. There could be no decree for specific performance in this action, because the proper parties are not before the Court for relief in that form. But, it is also true, that in order to adjudge that the defendants are entitled to the relief which they demand, the Court must first decide that the agreement to consolidate was a lawful and valid agreement which the two corporations were competent in law to make. We have seen that this could not be done; and it follows, as a necessary sequence, that the defendants have failed to establish the equitable title on which they rely. We cite in support of these propositions : Story on Contracts, Secs. 613–14; *Belding* v. *Pitkin*, (2 Caines. 147); *Hunt* v. *Knickerbacker*, (5 John. 326); *Wheeler* v. *Russell*, (17 Mass. 257); 1 Parsons on Contracts, 381; Chitty on Contracts, 695.

This view of the case renders it unnecessary to discuss the proposition, whether or not the agreement between the two companies to consolidate was in effect the creation of a partnership between them ; for even if that be its effect, and if it be conceded that it is competent for corporations to unite their business and capital, and thus establish a partnership between them, it is evident, for the reasons before stated, that they cannot do this on such terms and conditions as will have the effect to withdraw the capital and turn it over to the stockholders. It is, therefore, immaterial, whether or not the proposed arrangement was in effect the creation of a partnership. In that form, it would have been contrary to law, and, therefore, incapable of being enforced in equity, for the reasons already stated.

Nor is it material whether or not contracts for the transfer of such property are required to be in writing. If it be conceded that such property could be transferred by a parol contract, accompanied with a delivery of the possession, it would not aid the defendants. Whether by parol or in writing, the contract could not be upheld in a Court of Equity, because it is in violation of the statute, as already shown. This inherent vice would vitiate it, whether it be evidenced by writing or not.

This view of the case disposes of the question of ratifica-

tion by the trustees of the Eureka Lake Company, of the acts of its stockholders. If the act was contrary to law, it was incapable of ratification. No amount of ratification by the trustees could give vitality to an act prohibited by law; and we have discussed the question of the validity of the contract without reference to the fact whether or not it was executed or approved by the trustees in their corporate capacity. It is not capable of enforcement in a Court of Equity as against the plaintiff, by whomsoever it was executed or ratified.

It remains to be considered whether or not the plaintiff stands in such relation either to the property or to the defendants as that he is estopped from questioning the title of the defendants. The defendants insist upon the estoppel on two grounds, to wit: First—That the plaintiff's debt against the Eureka Lake Company, on which his judgment was founded, did not accrue until after the property had been transferred and the possession delivered to the Eureka Lake Water Company; and that the plaintiff, not being a creditor at the date of the transaction, and the Eureka Lake Company and its stockholders being content with it, whether it was strictly valid or not, the plaintiff is estopped from questioning its validity. Second—That the plaintiff having caused the property in contest to be sold and conveyed to the defendants under his judgment against the Eureka Lake Water Company, he is thereby estopped from setting up a prior adverse title, or the title which he afterward acquired by means of the Sheriff's deed.

In deciding the first point, we do not deem it necessary to inquire whether the plaintiff's debt accrued before or after the attempted execution of the agreement between the two companies. If the agreement was contrary to law, as we hold it to be, it cannot be enforced in equity against any creditor, either prior or subsequent, without notice of the transfer at the time of giving the credit of the corporation. As to all creditors of the company, prior or subsequent, it was simply void; and no reason has been suggested why a creditor who has in no way promoted the void act should be estopped from contesting it.

But it is claimed that the plaintiff, by the Sheriff's deed, acquired only such title as the Eureka Lake Company had, and is only substituted to the rights of that company as they existed when the plaintiff's attachment was levied; and that the said company was, at that date, estopped by its previous conduct from asserting title as against the Eureka Lake Water Company, and the defendants holding under it. Hence it is insisted that the plaintiff is estopped, because his grantor, the Eureka Lake Company was estopped before his title accrued. But to give effect to an estoppel, under these circumstances, would be to validate, by way of estoppel, a title which was unlawful in itself, as against a creditor, and which, as against him, could not be made valid by a direct conveyance. If the Eureka Lake Company had not the lawful right, by a direct conveyance, as against its creditors, to convey the title to the Eureka Lake Water Company, under the facts averred in the answer and found, can it be possible that a transaction imbued with this fatal infirmity as against creditors, can be purged of its infirmity by means of an estoppel? If so, the title by estoppel would be of superior power to a title founded on a direct conveyance from the party estopped. This is not sound law, and would pervert the whole theory of estoppel.

If it be conceded that the Eureka Lake Company and its stockholders were estopped, it does not follow that a creditor of said corporation is also estopped. The arrangement between the Eureka Lake Company and the Miners' Ditch Company, as the facts are alleged in the complaint and found, we have seen, was unlawful and invalid as to creditors. The defendants, Zellerbach and Powers, seek to establish an equity, as against the creditors, by which he shall be estopped from setting up a regular legal title. They claim, not by a title apparently regular, but by a deed manifestly, on its face, from strangers to the legal title. They claim, also, through a transaction apparently, at least, unlawful. They allege a state of facts showing an unlawful transaction, without setting out any other facts, that could render it lawful, and without showing a want of notice of its true character at the time their interest was acquired.

If Zellerbach and Powers advanced their money with a knowledge of all the facts of an irregular and unlawful transaction, no equity can arise out of it as against a creditor of the corporation, who has acquired the title by proceedings in all respects regular. As the defendants claim through a deed from strangers to the legal title, and through proceedings, in other respects, irregular and unlawful, it devolves upon them to affirmatively allege, and prove, other facts, if any there be, that render the proceeding regular, or facts showing that they acted in view of circumstances upon which they were entitled to rely, without notice of other facts tending to invalidate their title. This they have failed to do, and there is, consequently, no matter of estoppel disclosed by the record upon which they can rely.

On the second point, we have had some difficulty. The plaintiff caused his execution against the Eureka Lake Water Company to be levied upon the premises in contest as the property of that company; and at the execution sale the defendants purchased and have obtained the Sheriff's deed. Subsequently, the plaintiff levied his execution against the Eureka Lake Company, on the same property, as the property of the last named company, and having purchased it at the execution sale, has obtained the Sheriff's deed. Is he estopped from denying the title acquired by the defendants at the first execution sale?

The question may be solved by a few illustrations. If the same creditor hold separate demands against the mortgagor and mortgagee of a lot of land, and, after obtaining judgment against the mortgagor, sells his equity of redemption to a stranger, under an execution on the judgment; and if he afterwards obtains a judgment on his separate demand against the mortgagee, and under an execution on that judgment sells the title of the mortgagee and purchases it himself, is he estopped to deny the title of the purchaser at the first sale?

Or, if a creditor, holding separate demands against lessor and lessee, sells the title of the one, under his judgment, and afterwards purchases himself the title of the other,

under a judgment against him, is he estopped to deny the title of the first purchaser? It is plain he would not be estopped in either case. The reason is obvious: An execution-creditor has the right to sell any pretended title or claim of the judgment-debtor to any property whatsoever. If it turns out that he had no title, nothing passes by the sale; but the levy of an execution is not of itself a warranty, nor even an assertion, that the judgment-debtor has any valid title to the premises.

If the judgment-debtor has but a naked possession, or if he assert only a baseless claim to the property, the creditor has the right to subject it to his execution, without thereby committing himself to the purchaser, in the least degree, as to the nature or validity of the title to be sold. The mere act of causing property to be sold, under his execution, by the judgment-creditor, is, at most, but equivalent to a declaration that the judgment-debtor has, or claims to have, some kind of title to or interest in the property, but is not an averment that, in point of fact, he has any title whatsoever. Much less can it be held to be an averment that he has a *valid* title. The doctrine of estoppel *in pais*, proceeds wholly on the theory that the party to be estopped, has, by his declarations or conduct, misled another to his prejudice, so that it would be a fraud upon him to allow the true state of the facts to be proved. Can it be said, with truth, that a judgment-creditor, by the mere fact of causing whatever title or pretense of title the judgment-debtor had, to be sold under execution, has deluded the purchaser into the belief that the debtor had a *valid* title? The law will not presume the purchaser to be so deluded.

The authorities cited by defendants' counsel on this proposition, do not contravene this reasoning. In *Dezell* v. *Odell* (3 Hill, 215), a constable had seized personal property under execution, and delivered it to Dezell as a receiptor for safe keeping, taking a receipt for it, wherein Dezell agreed to re-deliver the property to the constable on a specified day. On demand by the constable for the property, Dezell refused to deliver it, alleging for the first time, title in himself.

In an action by the constable to recover the property, the

Court held, that having received the property from the constable without then asserting title to it, and having promised to re-deliver it, Dezell was estopped from setting up his title in that action, but must first restore the possession, and might afterwards litigate his title. The Court puts its ruling on the ground that Dezell "had fraudulently deprived the creditor of possession, though the officer, baffled him in his search for other property, and in the use of all means for collecting his debt, drawn him by equivocal conduct into the expense of an action, and at the trial claims the whole as constituting a legal defense." Under these circumstances, the Court held him to be estopped. But in an able dissenting opinion, Judge Bronson, we think, very clearly demonstrates that the ruling in that case was erroneous. But conceding it to be sound law, it fails to support the theory contended for in the case we are considering. The other authorities cited, only establish the proposition that a party standing by when property is offered for sale, and failing to notify purchasers of his title, or encouraging purchasers to buy it as the property of another, will be estopped from asserting his title.

But without adverting to other authorities, it is sufficient for us to say on this point, that the doctrine of estoppel *in pais* has been so often discussed in this Court, that the general principles which control it must be deemed to be definitively settled. When invoked in respect to the title, to constitute an estoppel, it must appear : First—That the party making the admission, by his declaration or conduct, was apprised of the true state of his own title ; Second—That he made the admission with the express intention to deceive, or with such careless or culpable negligence as to amount to constructive fraud ; Third—That the other party was not only destitute of all knowledge of the true state of the title, but of all convenient or ready means of acquiring such knowledge by the use of ordinary diligence; and, Fourth—That he relied directly upon such admissions, and will be injured by allowing its truth to be disproved. (*Biddle Boggs* v. *Merced Mining Co.* 14 Cal. 279 ; *McCracken* v. *City of San Francisco,*

16 *Id.* 626; *Davis* v. *Davis*, 26 *Id.* 41; *Bowman* v. *Cudworth*, 31 *Id.* 153.)

Tested by this rule, the plaintiff is not estopped from asserting his title. All that he is alleged to have done by way of estoppel, was to cause the property to be sold under his judgment against the Eureka Lake Water Company, at which sale the defendants purchased. It is not proved that he made any declarations as to the title, either intended or calculated to mislead the defendants; nor that the defendants were in any way influenced to buy, by anything that the plaintiff said or did in respect to the title, nor does it appear that they did not know the true state of the title when they bought. In short, the transaction lacks all the material elements of an estoppel.

This case rests for its solution on wholly different principles from those involved in the case of the *Miners' Ditch Company* v. *Zellerbach* (37 Cal. 543.) In that case, the Miners' Ditch Company had conveyed its title to the Eureka Lake Water Company by a regular and formal deed, under the seal of the corporation, and had delivered full possession under the deed. The Eureka Lake Water Company, whilst in possession, mortgaged the property to Zellerbach and Powers, who were strangers to the original transaction, and delivered the possession to them as mortgagees. Whilst in possession as mortgagees, Zellerbach and Powers acquired the equity of redemption of the Eureka Lake Water Company, and thereby obtained a complete legal title. The action was brought by the Miners' Ditch Company to recover the property which it had itself conveyed to the Eureka Lake Water Company, on the ground: First—That its conveyance was *ultra vires*, and therefore void; Second—That it was void because in contravention of the 13th Section of the Act of 1853, already quoted.

Zellerbach and Powers were strangers to the transactions between these three companies, and acquired the title without notice of the proceedings between them. Under these facts we held: First—That the conveyance to the Eureka Lake Water Company was not *ultra vires;* and, Second—That the Miners' Ditch Company, the grantor in the deed, which was

regular on its face, could not avail itself of the illegality of the consideration, to disturb the possession of subsequent purchasers who were strangers to the transaction, and had acquired the legal title in good faith, for a valuable consideration, without notice.

But in the case we are now considering, the facts are very different. First—The defendants have not acquired the title which remained in the Eureka Lake Company, until it was conveyed to the plaintiff; and, Second—It is not the Eureka Lake Company which seeks to avoid its contract, and to set aside a formal deed of conveyance, as in the case of the Miners' Ditch Company; but it is a *creditor* who has himself acquired the title, and insists that the transaction between the three companies was illegal and void as to him. Nor can the defendants in this case invoke the protection of a Court of Equity on the ground that they are innocent purchasers for value without notice: because, First—They have never acquired the legal title; and, Second—Their alleged equity is founded on transactions between the Eureka Lake Company and the Eureka Lake Water Company, which were illegal, and prohibited by law; and which a Court of Equity will not enforce under the facts found in this case, particularly against a creditor who has acquired the legal title.

We wish it to be expressly understood, that our decision is limited to the precise facts, as disclosed by the record. That it may not be regarded as covering broader grounds than intended, we deem it proper here to say, that we express no opinion upon the question whether property of the kind in question may be transferred by parol and the delivery of possession, or whether, if there are two rival corporations, like the Eureka Lake Company and the Miners' Ditch Company, organized for the same purpose of supplying water to a mining region where the demand is limited, which, in consequence of the greater expense of managing the two separately, and the competition, are both doing business at a loss, and are liable to become insolvent, it would not be lawful, in pursuance of their interests, to form a new corporation for the same purpose, and convey the property of both to such new corporation in the manner pursued in this instance,

provided the new corporation, as a part of the arrangement, should assume and become obligated to pay all the debts of the old corporation. Such an arrangement might be for the interest of all parties, creditors as well as stockholders, and if lawful, would be valid as to all. The personal liability of the stockholders, in such case, would continue, and no property would be withdrawn from liability to the creditors' demands. The prohibition of the thirteenth section of the Act concerning corporations, is directed against the trustees, and seems designed to protect creditors as such, and also to protect the stockholders against their mismanagement in distributing capital stock in the form of dividends, with a view of holding out the idea that the corporation is more prosperous than it is, for the purpose of promoting some unlawful object. If all parties interested are secured from injury, and the purpose is a lawful one, the object of the provision would seem to be accomplished, and there would be no one entitled to complain. Such a transaction was regarded as lawful in *Treadwell* v. *Salisbury Manufacturing Company* (7 Gray, 393.) But we do not intend to express any opinion on these grave questions now, for no sufficient facts are presented in the pleadings or findings to require it, and we only allude to the questions in order to guard our opinion in so important a case, from misconstruction or misapprehension.

Judgment reversed, and cause remanded for a new trial.

RHODES, J., expressed no opinion.

CROCKETT, J., delivered the following opinion of the Court, upon a re-hearing:

On a re-hearing which was granted in this cause, by consent of counsel, it was ably and elaborately argued by the respective counsel, both orally and in printed briefs; but after a careful consideration of the arguments, and a re-examination of the important and interesting questions involved in the case, we see no reason to change or modify the views expressed in the last opinion of the Court.

It is urged with much earnestness by counsel for the appellant, that we should order a final judgment for the plaintiff to be entered on the findings, and that the case should not be remanded for a new trial. The argument is, that there is no dispute about the facts, all of which are set forth in the findings, and that the only error of the District Court was in its conclusions of law from the facts found. Hence, it is said, there is no need for a new trial, which would only entail upon the parties a useless and vexatious expense and delay, without accomplishing any useful result. On the other hand, the counsel for the defendants insists that the only trial had in the Court below was on the equity side of the Court, and was confined to the issues raised by the equitable defenses set up in the answer, and that, if these be all finally decided against the defendants, they are, nevertheless, entitled to a trial of the issues raised in the action at law.

The action was tried before the Court, without a jury, and the more regular and orderly practice in such cases clearly is, first, to dispose of the equitable defenses set up in the answer. If these are found for the defendant, it will obviate, in most cases, the necessity of trying the law side of the action. But, if found against the defendant, he still has the right to be heard on his other defenses. When a jury is waived, and the whole case is tried before the Court, it is often difficult to ascertain from the record whether the trial was confined to the equitable defenses alone, or included all the issues in the cause. A loose practice has prevailed in this respect, which ought to be corrected, and which sometimes leads to the most perplexing difficulties. It should distinctly appear from the record that the equitable defenses were first tried and disposed of; or, if the whole action, and all the issues were tried and submitted together, that fact should appear, so that when the case comes into this Court, we shall not be left in doubt whether the whole action, or only the equity branch of it, was tried and decided in the Court below. This loose practice appears to have prevailed in this case. The complaint avers that the plaintiff is the owner, and entitled to the possession of the premises in

contest, and that the defendants wrongfully withhold the possession. The answer, first, denies the title of the plaintiff, and his right to the possession; second, avers generally that the defendants are the owners in fee, and entitled to the possession; and, third, sets up certain equitable defenses, and prays "that before the trial of this action this Court would determine and declare that the plaintiff, Joseph Martin, is estopped from setting up in this action any title to said property derived from the Eureka Lake Company, subsequent to the date of the organization of the Eureka Lake Water Company, and the possession by it of said property; and that said plaintiff be enjoined and restrained from setting up such title in this action," and for general relief.

In the natural order of business, it was the duty of the Court, first, to try and decide upon this equitable defense, before proceeding with the action at law. If it sustained the defendants' equities, as it did, it would only enjoin the plaintiff from setting up title under the Eureka Lake Company, acquired after the date specified in the answer; leaving untouched any other title the plaintiff might be able to show. This is all the Court attempted to do in its judgment, which was "that said plaintiff, Joseph Martin, be forever estopped, enjoined and restrained from asserting or setting up, as against the defendants, Zellerbach and Powers, and title to the premises described in the complaint, derived from the Eureka Lake Company subsequent to the possession of said premises by the Eureka Lake Water Company; *i. e.* subsequent to the 29th day of October, 1860, and that he be enjoined and restrained from setting up said title in this action," and that defendants recover their costs. The judgment is silent as to any other title the plaintiff may have. It does not attempt to adjudge that the plaintiff has no valid title, or is not entitled to the possession, but only enjoins him from asserting a particular title. There was nothing in the judgment to hinder the plaintiff from proceeding at once with a trial of the action at law, and relying on any other title he might have, except that which he was enjoined from asserting. In order to ascertain what was tried and decided, we can look only to the judgment; for nothing can be said

to be tried, in a legal sense, unless it was decided—and the judgment itself is the only evidence of what was decided. This judgment does not purport to decide upon the plaintiff's or defendants' title or right to the possession, but only enjoins the plaintiff from asserting a particular title, without undertaking to adjudicate upon the general title or right of possession, as between the plaintiff and defendants. Under this state of the record, if the point had been raised on the trial of the appeal, there may have been room for a grave doubt whether there was such a final judgment as authorized an appeal. But as this point has not been raised, we express no opinion upon it. It is quite evident, however, that in dealing with such a judgment, it would be altogether irregular for this Court to order the Court below to enter a final judgment, in advance of any adjudication by that Court, of all the issues raised by the pleadings.

The last opinion delivered by this Court, in the cause, will stand as the opinion and judgment of the Court, and it is ordered that the remittitur issue forthwith.

SANDERSON, J., expressed no opinion upon the re-hearing.

---

The following cases were affirmed on authority of *Hutton* v. *Frisbie* (37 Cal. 475.)

KNOWLES *v.* GREENWOOD.

TRUE *v.* TORMEY ET AL.

FOWLER *v.* FRISBIE.

TRUE *v.* THOMAS.

DIXON *v.* BROWNLIE.

MARTIN *v.* FRISBIE.

BROWN *v.* FRISBIE.

WHITNEY *v.* THOMAS.